Elmer BALVIK, Plaintiff and Appellee,

v.

Thomas SYLVESTER and Weldon Corporation, Defendants and Appellants.

Civ. No. 11373.

Supreme Court of North Dakota.

Aug. 20, 1987.

James R. Jungroth, of Mackenzie, Jungroth, Mackenzie & Reisnour, Jamestown, for plaintiff and appellee.

James A. Wright, of Hjellum, Weiss, Nerison, Jukkala, Wright & Paulson, Jamestown, for defendants and appellants.

VANDE WALLE, Justice.

This is an appeal from a district court judgment dissolving Weldon Corporation [Weldon] and appointing a liquidating receiver to dispose of its assets. We affirm in part, reverse in part, and remand with directions.

In November 1979 Elmer Balvik and Thomas Sylvester formed a partnership, Weldon Electric, for the purpose of engaging in the electrical contracting business. Balvik contributed $8,000 and a vehicle worth $2,000, and Sylvester contributed $25,000 to the partnership's assets. Although Sylvester's contribution under the terms of the articles of partnership was 70 percent, and Balvik's was 30 percent, both partners had an equal vote and equal rights in the management of the business.

The parties continued operating the business as a partnership until 1984, when, at Sylvester's urging, they decided to incorporate. Stock was issued to Balvik and Sylvester in proportion to their partnership ownership interests, with Sylvester receiving 70 percent and Balvik receiving 30 percent of the stock. Sylvester and his wife and Balvik and his wife were the four directors of the corporation, with Sylvester being elected president and Balvik being elected vice-president. The bylaws of the corporation provided that a shareholder was entitled to one vote for each share of stock owned; thus Balvik held only a minority voice in the management of the corporation. The bylaws also provided that the "sale of shares of stock by any shareholder shall be as [set] forth in a 'Buy-Sell Agreement' entered into by the shareholders." Although the subject of the "buy-sell agreement" was discussed on various occasions by the parties and an attorney had prepared a "stock redemption agreement" for their consideration, no separate agreements were executed by the parties.

In 1985 problems arose between the parties concerning their differences in philosophy of management of the corporation. Sylvester wanted excess profits reinvested into the corporation while Balvik wanted them withdrawn and paid out as bonuses or dividends. Sylvester also questioned Balvik's job performance. According to Balvik, during August 1985 he was fired as an employee of the corporation. According to Sylvester, Balvik was removed from his position as the foreman on a job the corporation was performing for the Ladish Malting Company in Spiritwood, but was not "fired" from his position with the corporation. In any event, Balvik no longer came to work for the corporation and began drawing unemployment benefits. He subsequently obtained employment at the Ladish Malting Company.

In October 1985, Balvik brought this action seeking Weldon's dissolution or, in the alternative, that he be paid the "true value" of his stock. He also sought punitive damages. Balvik alleged that Sylvester had breached a fiduciary duty he owed to Balvik and that Sylvester had been guilty

of oppression and malice by discharging him from employment with the corporation. Balvik also alleged other instances of misconduct by Sylvester and asserted that he had "reasonable expectations ... that he would be treated as a partner, furnished employment and not discharged merely because he did not hold an equal amount of stock."

In January 1986 Weldon held its annual shareholders meeting. On the strength of Sylvester's 70 percent of the voting shares, the bylaws were amended to reduce the number of directors from four to three, and to reduce the number needed for a quorum from three to two. Sylvester, his wife, and Peter Sylvester were voted in as the new directors of the corporation. The directors then voted in Peter Sylvester as the new vice-president, removing Balvik from that office. It does not appear from the record that Weldon has declared a dividend or that Balvik has received any money from the corporation since August 1985.

The trial court ruled in favor of Balvik, finding that Sylvester had discharged Balvik from his employment with the corporation[1] and had discharged Balvik and his wife as members of the board of directors, leaving Balvik without any benefit from his 30–percent ownership in the corporation. The court concluded that Sylvester, through a series of acts culminating with the January 1986 shareholders meeting, effectively prevented Balvik "from participating in the management or operation of Weldon Corporation, thus constituting 'oppressive' behavior under Sec. 10–21–16, N.D.C.C., and establishing sufficient grounds for the dissolution of Weldon Corporation." This appeal followed.

■ The issue on appeal is whether Sylvester's actions amounted to "oppressive" conduct under § 10–21–16(1)(b), N.D.C.C.,[2] sufficient to justify the forced dissolution of Weldon. That section provides in pertinent part:

*"10–21–16. Jurisdiction of court to liquidate assets and business of corporation.—* The district courts of the state of North Dakota shall have full power to liquidate the assets and business of a corporation:

"1. In an action by a shareholder when any of the following is established:

\*　　\*　　\*　　\*　　\*　　\*

"b. That the acts of the directors or those in control of the corporation are illegal, oppressive, or fraudulent."

"Oppressive" conduct is not defined in the statute or in the Model Business Corporation Act, from which our statute was derived. See Model Business Corporation Act Annotated § 97, at p. 554 (2d ed. 1971);

1. The appellants assert that the trial court failed to make a finding of fact resolving whether Balvik was fired as an employee of the corporation in August 1985 or whether he voluntarily quit. The trial court's finding of fact relating to the August 1985 Ladish Malting Company incident, like several of the other findings, merely recites the conflicting testimony and assertions of the parties. The trial court, however, did determine that Balvik was discharged from employment in a finding which states that "the Defendant Sylvester caused a Board of Directors meeting to be held and discharged the Plaintiff from employment and discharged the Plaintiff and his wife as members of the Board of Directors." This finding presumably refers to the January 1986 annual shareholders meeting, and there is no evidence to support the statement that Balvik was discharged from his employment at this time. The trial court elsewhere in its findings and conclusions also refers to "the Defendant's action in firing the Plaintiff ..."

Although the trial court's findings are ambiguous on this matter, because the trial court found that Balvik was in fact fired or discharged from his employment with the corporation, and because the only evidence that would support such a finding relates to the August 1985 incident, we conclude the trial court determined that Sylvester fired Balvik from employment in August 1985.

2. The provisions of § 10–21–16, N.D.C.C., were repealed by the 1985 Legislative Assembly and replaced with provisions in Chapter 10–19.1, N.D.C.C. See 1985 N.D.Sess.Laws Ch. 147. The revised North Dakota Business Corporation Act became applicable to all existing corporations after June 30, 1986, but existing corporations were also given the opportunity to elect to be governed by Chapter 10–19.1, N.D.C.C., after June 30, 1985. See *KBM, Inc. v. MacKichan*, 386 N.W.2d 914, 916 n. 1 (N.D.1986). Weldon did not elect to be governed by the provisions of the new Act. Consequently, the provisions of § 10–21–16, N.D.C.C., are applicable to this case.

see also, *Robertson's Inc. v. Renden,* 189 N.W.2d 639 (N.D.1971). Courts construing the Model Act have noted that there are no specific elements necessary for a finding of oppression, but that it is an expansive term that is used to cover a multitude of situations dealing with improper conduct which is neither "illegal" nor "fraudulent." E.g., *McCauley v. Tom McCauley & Son, Inc.,* 104 N.M. 523, 724 P.2d 232 (Ct.App.1986), and cases cited therein. As the court stated in *White v. Perkins,* 213 Va. 129, 189 S.E.2d 315, 319 (1972):

> "The word 'oppressive,' as used in the statute does not carry an essential inference of imminent disaster; it can contemplate a continuing course of conduct. The word does not necessarily savor of fraud, and the absence of 'mismanagement, or misapplication of assets,' does not prevent a finding that the conduct of the dominant directors or officers has been oppressive. It is not synonymous with 'illegal' and 'fraudulent.'"

The statutory concept of oppressive conduct, and the broad and imprecise definitions of the term given by the courts, is best understood by examining the nature and characteristics of close corporations. The typical attributes of a close corporation are that: (1) the shareholders are few in number, often only two or three; (2) the shareholders usually live in the same geographical area, know each other, and are well acquainted with each other's business skills; (3) all or most of the shareholders are active in the business, usually serving as directors or officers or as key participants in some managerial capacity; and (4) there is no established market for the corporate stock. 1 F. O'Neal and R. Thompson, *O'Neal's Close Corporations* § 1.07 (3d ed. 1987); see also, D. MacDonald, *Corporate Behavior and the Minority Shareholder: Contrasting Interpretations of Section 10–19.1–115 of the North Dakota Century Code,* 62 N.D.L.Rev. 155 (1986); *Sorlie v. Ness,* 323 N.W.2d 841, 845 n. 2 (N.D.1982). Thus it is generally understood that, in addition to supplying capital and labor to a contemplated enterprise and expecting a fair return, parties comprising the ownership of a close corporation expect to be actively involved in its management and operation. See *Matter of Kemp & Beatley, Inc.,* 64 N.Y.2d 63, 484 N.Y.S.2d 799, 473 N.E.2d 1173 (1984). One leading commentator observed:

> "Unlike the typical shareholder in a publicly held corporation, who may be simply an investor or a speculator and does not desire to assume the responsibilities of management, the shareholder in a close corporation considers himself or herself as a coowner of the business and wants the privileges and powers that go with ownership. Employment by the corporation is often the shareholder's principal or sole source of income. As a matter of fact, providing for employment may have been the principal reason why the shareholder participated in organizing the corporation. Even if shareholders in a close corporation anticipate an ultimate profit from the sale of shares, they usually expect (or perhaps should expect) to receive any immediate return in the form of salaries as officers or employees of the corporation rather than in the form of dividends on their stock. Earnings of a close corporation, often are distributed in major part in salaries, bonuses and retirement benefits, a fact which illustrates how some business policies in a close corporation are more likely than in a publicly held corporation to be determined by tax consequences." 1 F. O'Neal and R. Thompson, *supra,* at p. 25. [Footnotes omitted.]

The limited market for stock in a close corporation and the natural reluctance of potential investors to purchase a noncontrolling interest in a close corporation that has been marked by dissension can result in a minority shareholder's interest being held "hostage" by the controlling interest, and can lead to situations where the majority "freeze out" minority shareholders by the use of oppressive tactics. See *McCauley, supra;* 2 F. O'Neal, *Close Corporations* § 9.02 (2d ed. 1971).

> "Freeze-outs are actions taken by the controlling shareholders to deprive a minority shareholder of her interest in the business or a fair return on her invest-

ment. A variety of freeze-out techniques exist, with the withholding of dividends being by far the most commonly applied technique. This technique is often combined with the discharge of the minority shareholder from employment and removal of the minority shareholder from the board of directors. If the minority shareholder is employed by the corporation full time, as is typical, and if she relies on her salary as her primary means of obtaining a return on her investment, as is typical, she is suddenly left with little or no income and little or no return on her investment. The controlling shareholders may effectively deprive the minority shareholder of every economic benefit that she derives from the corporation. Meanwhile, the controlling shareholders may continue to receive a substantial return based on their continuing employment with the corporation. The minority shareholder's investment serves only to ensure the success of the corporation for the benefit of the controlling shareholders."

D. MacDonald, *supra*, 62 N.D.L.Rev. at 164–165 (Footnotes omitted); see also, Note, *Freezing Out Minority Shareholders*, 74 Harv.L.Rev. 1630 (1961).

Because of the predicament in which minority shareholders in a close corporation are placed by a "freeze out" situation, courts have analyzed alleged "oppressive" conduct by those in control in terms of "fiduciary duties" owed by the majority shareholders to the minority and the "reasonable expectations" held by the minority shareholders in committing their capital and labor to the particular enterprise. See generally Annot., *What Amounts to "Oppressive" Conduct under Statute Authorizing Dissolution of Corporation at Suit of Minority Stockholders*, 56 A.L.R.3d 358 (1974); D. MacDonald, *supra*.

For example, the court in *Donahue v. Rodd Electrotype Co. of New England, Inc.*, 367 Mass. 578, 593, 328 N.E.2d 505, 515 (1975), noting the resemblance of a close corporation to a partnership, held that stockholders in a close corporation owe one another substantially the same fiduciary duty of utmost good faith and loyalty in the operation of the enterprise that partners owe to one another. The court stated: "Stockholders in close corporations must discharge their management and stockholder responsibilities in conformity with this strict good faith standard. They may not act out of avarice, expediency or self-interest in derogation of their duty of loyalty to the other stockholders and to the corporation." See also, *Alaska Plastics, Inc. v. Coppock*, 621 P.2d 270 (Alaska 1980); *Jones v. H.F. Ahmanson & Company*, 1 Cal.3d 93, 81 Cal.Rptr. 592, 460 P.2d 464 (1969); *Fix v. Fix Material Co., Inc.*, 538 S.W.2d 351, 358 (Mo.Ct.App.1976); *Baker v. Commercial Body Builders, Inc.*, 264 Or. 614, 507 P.2d 387 (1973).

Recognizing that a minority shareholder who reasonably expects that ownership in the corporation would entitle him to a job, a share of corporate earnings, and a place in corporate management would be "oppressed" in a very real sense when the majority seeks to defeat those expectations and there exists no effective means of salvaging the investment, the court in *Matter of Kemp & Beatley, Inc., supra*, 64 N.Y.2d at 73, 484 N.Y.S.2d at 805, 473 N.E.2d at 1179, held that a complaining shareholder's "reasonable expectations" can be used as a means of identifying and measuring conduct alleged to be oppressive. The court stated that "oppression should be deemed to arise only when the majority conduct substantially defeats expectations that, objectively viewed, were both reasonable under the circumstances and were central to the petitioner's decision to join the venture," and further explained: "A court considering a petition alleging oppressive conduct must investigate what the majority shareholders knew, or should have known, to be the petitioner's expectations in entering the particular enterprise. Majority conduct should not be deemed oppressive simply because the petitioner's subjective hopes and desires in joining the venture are not fulfilled. Disappointment alone should not necessarily be equated with oppression." See also, *O'Donnel v. Marine Repair Services, Inc.*, 530 F.Supp. 1199 (S.D.N.Y.1982) (applying New York law);

*McCauley, supra; Application of Taines,* 111 Misc.2d 559, 444 N.Y.S.2d 540 (1981); *Application of Topper,* 107 Misc.2d 25, 433 N.Y.S.2d 359 (1980).

■ Measuring the conduct alleged to be oppressive in this case in light of the "fiduciary duty" and "reasonable expectation" concepts, we cannot say that the trial court erred in finding that Sylvester's cumulative actions amounted to "oppression" within the meaning of § 10–21–16(1)(b), N.D.C.C.[3] Balvik quit his former job to join Sylvester in the new business enterprise, making a relatively substantial investment in the process. It is apparent from the record that Balvik's involvement with Weldon constituted his primary, if not sole, source of livelihood and that he quite reasonably expected to be actively involved in the operations of the business. Due mainly to the different business philosophies of Balvik and Sylvester, disputes often arose regarding the handling of the corporation's profits. Balvik was ultimately fired as an employee of the corporation, thus destroying the primary mode of return on his investment. Any slim hope of gaining a return on his investment and remaining involved in the operations of the business was dashed when Sylvester removed Balvik as a director and officer of the corporation. Since that time Balvik has apparently received nothing from the corporation, and considering Sylvester's inclination to reinvest profits in the corporation, the possibility of a declaration of dividends in the near future appears remote. We find little relevance in whether Sylvester discharged Balvik from employment for cause, or in the fact that Balvik's removal as a director and officer of the corporation occurred only after Balvik brought the instant suit. See generally *Application of Topper, supra.* The ultimate effect of these actions is that Balvik clearly has been "frozen out" of a business in which he reasonably expected to participate. As a result, Balvik is entitled to relief.

■ We have recognized that forced dissolution of a corporation is a drastic remedy which should be invoked with extreme caution and only when justice requires it. *KBM, Inc. v. MacKichan,* 386 N.W.2d 914 (N.D.1986). In a sense, a forced dissolution allows minority shareholders to exercise retaliatory "oppression" against the majority. *Alaska Plastics, Inc., supra; Baker, supra.* Although § 10–21–16, N.D.C.C., mentions only dissolution as a remedy for oppressive conduct, we agree with those courts which have interpreted their similar statutory counterparts to allow alternative equitable remedies not specifically stated in the statute. See *Alaska Plastics, Inc., supra; Sauer v. Moffitt,* 363 N.W.2d 269 (Iowa Ct.App.1984); *McCauley, supra; Baker, supra.* In *Baker, supra,* 264 Or. at 631–633, 507 P.2d at 395–396, the court stated:

"Depending upon the facts of the case and the nature of the problem involved, various alternative remedies may be appropriate. Among those suggested are the following:

"(2) The directors or those in control of the corporation have acted fraudulently, illegally, or in a manner unfairly prejudicial toward one or more shareholders in their capacities as shareholders, directors, or officers, or as employees of a closely held corporation;

\*    \*    \*    \*    \*    \*

"3. In determining whether to order equitable relief or dissolution, the court shall take into consideration the duty which all shareholders in a closely held corporation owe one another to act in an honest, fair, and reasonable manner in the operation of the corporation and the reasonable expectations of the shareholders as they exist at the inception and develop during the course of the shareholders' relationship with the corporation and with each other."

---

**3.** We note that under the provisions of our revised Business Corporation Act, the term "oppressive" conduct has been removed from the involuntary dissolution statute as a basis for relief and replaced with the term "unfairly prejudicial." Section 10–19.1–115, N.D.C.C., further codifies the "fiduciary duty" and "reasonable expectation" concepts as matters to be taken into consideration by the court:

"*10–19.1–115. Involuntary dissolution.*

"1. A court may grant any equitable relief it deems just and reasonable in the circumstances or may dissolve a corporation and liquidate its assets and business:

\*    \*    \*    \*    \*    \*

"b. In an action by a shareholder when it is established that:

\*    \*    \*    \*    \*    \*

"(a) The entry of an order requiring dissolution of the corporation at a specified future date, to become effective only in the event that the stockholders fail to resolve their differences prior to that date;

"(b) The appointment of a receiver, not for the purposes of dissolution, but to continue the operation of the corporation for the benefit of all the stockholders, both majority and minority, until differences are resolved or 'oppressive' conduct ceases;

"(c) The appointment of a 'special fiscal agent' to report to the court relating to the continued operation of the corporation, as a protection to its minority stockholders, and the retention of jurisdiction of the case by the court for that purpose;

"(d) The retention of jurisdiction of the case by the court for the protection of the minority stockholders without appointment of a receiver or 'special fiscal agent';

"(e) The ordering of an accounting by the majority in control of the corporation for funds alleged to have been misappropriated;

"(f) The issuance of an injunction to prohibit continuing acts of 'oppressive' conduct and which may include the reduction of salaries or bonus payments found to be unjustified or excessive;

"(g) The ordering of affirmative relief by the required declaration of a dividend or a reduction and distribution of capital;

"(h) The ordering of affirmative relief by the entry of an order requiring the corporation or a majority of its stockholders to purchase the stock of the minority stockholders at a price to be determined according to a specified formula or at a price determined by the court to be a fair and reasonable price;

"(i) The ordering of affirmative relief by the entry of an order permitting minority stockholders to purchase additional stock under conditions specified by the court;

"(j) An award of damages to minority stockholders as compensation for any injury suffered by them as the result of 'oppressive' conduct by the majority in control of the corporation." [Footnotes omitted.]

Under the circumstances, we believe the trial court abused its discretion in ordering the extreme remedy of dissolution. Weldon is apparently an on-going business and, under the facts presented, ordering its dissolution and liquidation is unduly harsh. Balvik, in his complaint, sought as an alternative remedy that "the Defendant pay to the Plaintiff the true value of his stock in the Corporation ..." This is similar to alternative remedy (h) listed above and, we believe, is the appropriate remedy here. Consequently, we remand this case for the entry of an order requiring either Weldon [4] or Sylvester to purchase Balvik's stock at a price determined by the court to be the fair value thereof. See *KBM, Inc., supra.* The court may conduct any further proceedings it deems necessary for resolution of the issue. The parties are, of course, free to agree to other alternative methods of resolving this dispute.

We affirm the trial court's determination that Sylvester's conduct was oppressive under § 10–21–16(1)(b), N.D.C.C., but we reverse the trial court's order of dissolution and remand the case for further proceedings.

ERICKSTAD, C.J., and LEVINE, MESCHKE and GIERKE, JJ., concur.

---

**4.** In *Evanenko v. Farmers Union Elevator,* 191 N.W.2d 258, 262 (N.D.1971), this court stated that, in view of § 10–19–05, N.D.C.C., "a business corporation cannot be compelled to purchase its own shares of stock held by a deceased member" because a corporation "cannot purchase such shares unless earned surplus is available for that purpose." The limitations on a corporation's right to purchase its own shares, however, are not applicable when the corporation purchases its own shares for the purpose of "[p]aying dissenting shareholders entitled to payment for their shares under the provisions of chapters 10–19 through 10–23." § 10–19–05(c), N.D.C.C.