Lawrence L. MASCHMEIER, and Kenneth L. Maschmeier, Individually and as Shareholders of the Southside Press, Ltd., Plaintiffs-Appellees,

v.

SOUTHSIDE PRESS, LTD., An Iowa Corporation, Kenneth E. Maschmeier, and Charlotte A. Maschmeier, Defendants-Appellants.

No. 87–1102.

Court of Appeals of Iowa.

Nov. 29, 1988.

As Corrected Feb. 10, 1989.

Frank W. Pechacek, Jr. of Smith, Peterson, Beckman & Willson, Council Bluffs, for defendants-appellants.

Michael J. Winter, Council Bluffs, for plaintiffs-appellees.

Heard by DONIELSON, P.J., and HAYDEN and HABHAB, JJ.

HABHAB, Judge.

Defendant Kenneth E. Maschmeier and Charlotte A. Maschmeier created a corporation, Southside Press, Ltd., that did business at 1220 Second Avenue North in Council Bluffs. This building is owned by Kenneth and Charlotte and was leased by them to the corporation.

Kenneth and Charlotte are the majority shareholders, with each having 1300 shares. They are the only officers and directors of the corporation.

They gifted to their two sons, Kenneth L. Maschmeier (Marty) and Lawrence L. Maschmeier (Larry), each 1200 shares of stock. All the parties were employed by Southside Press until the summer of 1985 when, because of family disagreements, Marty and Larry were terminated as employees. The parents then blocked an attempt by the sons to borrow against their pension and profit sharing plans. On August 1, 1985, the parents discontinued their employment with Southside.

The parents on August 2, 1985, created a new corporation, Southside Press of the Midlands, Ltd. They are its only officers and directors. As individuals they terminated the lease of their building at 1220 2nd Avenue North with Southside and leased the same premises to Midlands. In addition, Kenneth, as president of Southside, entered into a lease with himself as president of Midlands whereby the printing equipment and two of the vehicles were leased to Midlands for $22,372 per year for five years, with an option to buy such assets at the end of the lease term at their fair market value but not to exceed $20,-000. In addition, the inventory and two other vehicles owned by Southside were

sold by it to Midlands. Notwithstanding the fact that a substantial part of the assets of Southside had been disposed of, the parents still received an annual salary from it of more than $20,000.

After Marty and Larry's employment with Southside had terminated, each obtained employment with other printing companies in the same metropolitan area. The family disagreement continued. All stockholders were employed by companies that were competitive to Southside. Ultimately, the parents, as majority shareholders, offered to buy the sons' shares of stock for $20 per share. Their sons felt that this amount was inadequate. Thus, this lawsuit.

In 1985, Southside Press had gross sales of more than $600,000. The trial court found that in 1985 the corporate assets had a fair market value of $160,745. Shareholders' equity was found to be $236,-502.92, and divided by the number of shares equals $47.30 per share. The court found that the majority shareholders had been abusive and oppressive to the minority shareholders by wasting the corporate assets and leaving Southside Press only a shell of a corporation. The court ordered the majority shareholders to pay $47.30 per share to the sons, or $56,760 to each son, plus interest at the maximum legal rate from the date of the filing of the petition.

Kenneth and Charlotte first argue that they were not abusive and oppressive to the minority shareholders. They point out that Marty and Larry were well compensated while they were employed by Southside Press. They ask that the majority shareholders not be oppressed by the minority.

Defendants' second argument is that the lease to Southside Press of the Midlands does not misapply or waste the corporate assets because the amount of the lease was reasonable. They feel that the district court overvalued the corporate assets. Third, defendants assert that because the assets were not valued correctly, the stock was not valued correctly. Fourth, defendants state that the shares were valued at $20 pursuant to the corporate bylaws and should be enforced as an agreement of the shareholders. Finally, defendants oppose a finding of fact by the trial court that a new trustee should be appointed to manage the corporation pension and profit sharing plans.

The individual defendants in their brief advise us they have no objection to that part of the trial court's ruling which required them, as the majority stockholders, to purchase the shares of stock of the minority stockholders. They do object, however, to the valuation placed on the stock by the court and certain of its findings and conclusions that relate thereto.

On our de novo review, we must determine whether or not the majority shareholders acted oppressively towards the minority shareholders and/or misapplied or wasted corporate assets.

> Whenever a situation exists which is contrary to the principles of equity and which can be redressed within the scope of judicial action, a court of equity will devise a remedy to meet the situation though no similar relief has been granted before.

*Holden v. Construction Machinery Company,* 202 N.W.2d 348, 363–64 (Iowa 1972). The district court has the power to liquidate a corporation under section 496A.94(1). *Holi–Rest, Inc. v. Treloar,* 217 N.W.2d 517, 527 (Iowa 1974). This statute also allows the district court to fashion other equitable relief. Iowa Code § 496A.94(1) (1987).

It is contended that, in order for the trial court to have properly invoked the powers under section 496A.94(1), it had to find either the majority shareholders were oppressive in their conduct towards the minority shareholders, or that the majority shareholders misapplied or wasted corporate assets. Iowa Code § 496A.94(1)(c) and (e) (1987).

"Oppressive" conduct is not defined in the statute or in the Model Business Corporation Act, from which our statute was derived. The North Dakota Supreme Court, however, in *Balvik v. Sylvester,* considered the definition of oppressive conduct at length. *Balvik v. Sylvester,* 411 N.W.2d 383 (N.D.1987). There, the court found

that oppressive conduct, under an identical statute permitting dissolution of a corporation when the directors or others in control of the corporation engage in such conduct, is an expansive term used to cover a multitude of situations dealing with improper conduct which is neither illegal nor fraudulent. *Id.* at 385. The alleged oppressive conduct by those in control of a close corporation must be analyzed in terms of "fiduciary duties" owed by majority shareholders to the minority shareholders and "reasonable expectations" held by minority shareholders in committing capital and labor to the particular enterprise, in light of the predicament in which minority shareholders in a close corporation can be placed by a "freeze-out" situation. *Id.* at 386–87.

In the *Balvik* case, the court found that the ultimate effect of the actions of the close corporation's president, which included the firing of the vice president who was a minority shareholder and removing him as director and officer of the corporation, was to freeze him out from the business in which he reasonably expected to participate, and this conduct, thus, constituted oppression within the statute providing relief for the minority shareholder in such a situation. *Id.* at 388. The trial court found a similar situation here, i.e., the majority shareholders attempted to "freeze out" or "squeeze out" the minority shareholders by terminating their employment and not permitting them to participate in the business.

In the case of *Baker v. Commercial Body Builders Inc.,* 264 Or. 614, 507 P.2d 387, 392 (1973), the Oregon Supreme Court determined that court decisions are "outmoded" which allow a "squeeze out" or "freeze out" of minority stockholders. They used as an example the case of the shareholder-director-officers refusing to declare dividends, but providing high compensation for themselves and otherwise enjoying to the fullest the "patronage" which corporate control entails, leaving minority shareholders who do not hold corporate office with the choice of getting little or no return on their investments for an indefinite period of time or selling out to the majority shareholders at whatever price they will offer.

The *Baker* court defined oppressive conduct as that conduct which is "burdensome, harsh and wrongful conduct; a lack of probity and fair dealing with the affairs of a company to the prejudice of some of its members, or a visual departure from the standards of fair dealing, and a violation of fair play on which every shareholder who entrusts his money to a company is entitled to rely." *Id.* 507 P.2d at 393.

The appellees contend that the majority shareholders also misapplied or wasted the corporate assets and they liken the situation here to *Sauer v. Moffitt,* 363 N.W.2d 269 (Iowa App.1984). There, the parents owned a family farm operation and had four children, two sons and two daughters. *Id.* at 270. The sons were actively involved in the business with their father, while the daughters moved out of state, but continued to own a minority stockholder interest. *Id.* at 271. While operating the family farm corporation, the father admittedly commingled his personal crops with those of corporate crops. *Id.* at 274. He also diverted corporate assets and feed into his own livestock operation. *Id.* The court found that the majority stockholders misapplied corporate assets. *Id.* at 275.

As previously stated, the trial court found that the majority stockholders acted oppressively, and had misapplied or wasted the assets of the corporation. In this respect, the trial court made, among others, the following finding which we take from its ruling: 1) On August 1, 1985, the majority stockholders terminated the lease agreement of Southside Press, Ltd. for the building at 1220 Second Avenue. 2) On August 2, 1985, the majority stockholders incorporated a new business called Southside Press of the Midlands, Ltd. 3) On August 2, 1985, Kenneth Maschmeier, as president of Southside Press, Ltd., entered into a lease agreement with Kenneth Maschmeier as president of Southside Press of the Midlands, Ltd., leasing all of the then existing assets of Southside Press, Ltd. to the new corporation on a five-year lease for $18,172 per year, and granting Southside

Press of the Midlands, Ltd. an option to purchase all of those assets for the sum of $20,000 at the end of the rental period, which would be August 1, 1990. (We note from the record that the total annual lease equaled $22,372, which included, along with the printing equipment, two vehicles.) 4) The gross receipts of Southside Press, Ltd. have gone from $613,258 for the fiscal year ending March 31, 1985, to $18,172, which are the payments made under the lease agreement. 5) The majority shareholders are giving themselves salaries as officers of Southside Press, Ltd. in excess of the gross receipts of that corporation. (We note that the gross salaries for the two for the fiscal year ending March 31, 1987, equaled $20,266.48.) 6) The majority shareholders have purchased and are operating a sole proprietorship called Holmes Printing, which they testified is in competition with Southside Press, Ltd. and which, as per their testimony, is using and/or storing some of the corporate assets of Southside Press, Ltd. The trial court found that this was not in the best interests of Southside Press, Ltd. because its only officers and majority stockholders were operating a business in competition with the old corporation. (The appellant argues that Holmes Printing is not operated in competition with Southside for Southside is no longer in business.) 7) The majority shareholders have started a new corporation called Southside Press of the Midlands, Ltd., which employs most of the old employees of the old corporation, which has taken almost all of the former customers of Southside Press, Ltd. Testimony of Kenneth Maschmeier, president of Southside Press of the Midlands, Ltd., indicates that the latter corporation is generating income in excess of the former Southside Press, Ltd. 8) By corporation resolution, the majority shareholders have prohibited the minority shareholders from borrowing upon their pension and profit sharing plan. 9) In transferring or leasing the assets from one corporation to another, the majority shareholders failed to include any value for inventory and have given inadequate explanations as to the whereabouts of the inventory formerly held by Southside Press, Ltd.

(The appellants argue that the inventory was sold to Midlands and that the father permitted the inventory to be depleted for Southside was not going to continue its operation.) 10) Should the majority shareholders be allowed to continue their present operation of the business of Southside Press, Ltd., in five years the corporation will have only $20,000, which is the payment that it will receive from Southside Press of the Midlands, Ltd. for the purchase of their equipment. (The appellant challenges this finding by arguing that the corporation would also have funds from the interest paid by the parents on their loans from the corporation along with the difference between the total lease rent less the salaries paid.)

We concur with the trial court's findings that the majority shareholders acted oppressively toward the minority shareholders and wasted corporate assets. In this respect, we further determine that the trial court properly invoked Iowa Code section 496A.94 when it fashioned the remedy requiring the majority shareholders to purchase the shares of the minority.

But that does not resolve the problem, for as stated above, the appellant does not on appeal challenge that part of the court's ruling that ordered the majority shareholders to purchase the minority's stock. The appellant challenges the method fashioned by the trial court in fixing the value of the stock and payment thereof by asserting it should be governed by the bylaws.

The articles of incorporation of Southside vested in the directors of the corporation the "authority to make provisions in the Bylaws of the corporation restricting the transfer of shares of this corporation." This the board of directors did when they adopted the following bylaw that relates to restrictions on the transferability of stock:

SECTION 3. RESTRICTIONS ON STOCK TRANSFER. No shareholder may voluntarily by sale, gift, or bequest transfer to any person, other than the corporation, any of the capital stock registered of record in the name of such shareholder upon the stock record book unless such shareholder or representa-

tive thereof first offers, in writing, said stock for sale to the corporation at the price agreed upon by the shareholders at each annual meeting. The shareholders shall agree upon the value of the stock at each annual meeting and in the event that they are unable to agree, then each shareholder shall appoint an appraiser and the appraisers shall appoint yet another appraiser who shall then act as a Board of Appraisers to value the shares of stock in thereby annually set a price of each share of stock. The corporation shall have thirty (30) days from the date of said written notice in which to accept or reject the offer to sell and if said offer is not accepted by the Board of Directors of the corporation within said thirty (30) day period, such shareholder or representative thereof may transfer any of such capital stock to persons other than the corporation. If the corporation does accept the offer within the specified (30) day period, then the corporation shall have the right to the twenty-five percent (25%) down payment with up to a maximum of five (5) years to make no less than one (1) annual installment payment with interest on the unpaid balance at each of said five-year period and said interest on the unpaid balance being at the rate of seven percent (7%) per annum.

The appellant argues that the trial court, in determining the value of the stock should have used the $20 value fixed by the shareholders at their last annual meeting. But at the last annual meeting the shareholders were unable to agree. The appellant recognized this problem in his brief when he states that "Marty's testimony as to his recollection is that he voted against it but did not exercise his right of appraisal."

Section 3 is a restriction on stock transfer. If a shareholder intends to sell his stock, he must first offer it to the corporation at a price "agreed upon by the shareholders at each annual meeting." The shareholders must agree on the value of the stock and if they are unable to do so, each has a right to select an appraiser and the appraisers shall appoint another and in this instance the five appraisers are to act as a Board of Appraisers to value the stock.

■ We do not agree with the plaintiff's assertion that the minority stockholders are at the mercy of the majority stockholders when it comes to placing a value on the stock. We interpret section 3 to mean that all shareholders must agree as to the stock value. It is clear that Marty did not agree. Thus the valuation question remains open. True, Marty had the right to select an appraiser. But then so did the others. Since none of the shareholders requested appraisers, we deem this, as the trial court did, to be a waiver. We concur with this statement from the trial court's ruling: "All parties have left the Court with the burden of evaluating the corporate stock."

■ It is clear in Iowa that once oppression, waste, or misapplication of the corporate assets has been found, the trial court, sitting in equity, can devise a remedy to meet the situation. Iowa Code § 496A.94(1)(c) and (e) (1987); *Sauer v. Moffitt*, 363 N.W.2d at 275; *Holden v. Construction Machinery Company*, 202 N.W.2d at 363–64. In the *Sauer* case, we referred to an Oregon statute identical to section 496A.94 of the Iowa Code, which specifies alternative remedies that might be provided by the court. *Sauer v. Moffitt*, 363 N.W.2d at 274. The Oregon statute, among other things, allows the court to order the majority stockholders to purchase the stock of the minority stockholders at a price to be determined according to a specified formula or at a price determined by the court to be fair and reasonable. *Id.* at 274–75.

■ We agree with the defendants that a contractual formula price is enforceable even if the formula price is less than its fair market value. *Jenkins v. Haworth, Inc.*, 572 F.Supp. 591, 599 (W.D.Mich.1983). But here the parties were unable to agree to a price, i.e., at the last meeting of the stockholders. Thus the trial court was called upon to do so.

Courts have generally held that no one factor governs the valuation of shares; but that all factors, such as market value, asset

value, future earning prospects, should be considered. 13 W. Fletcher, *Cyclopedia Corporations*, § 5899 et seq., at 335 (1961). In this case, the parties relied rather heavily on what is referred to in the record as book value (shareholders' equity) in arriving at stock value. The trial court likewise used shareholder equity but adjusted that amount by the present day fair market value of corporate assets.

It is not likely that the shareholders' equity here can ever be determined with any degree of exactness. This is so because of the commingling of personal affairs with corporate business. In this respect, there are a number of personal transactions indulged in by all parties to this lawsuit that bear on the problem.

■ We determine that under the circumstances here the valuation per share as fixed by the trial court and the method it employed in arriving at value is fair and reasonable. However, we further conclude that the amount Larry and Marty are to receive must be reduced by the total amount of loans made to them as they appear on the corporate books.

As noted, there are a number of transactions that appear on the corporate books that involved personal transactions of the stockholders. Some of these transactions appear on the corporate balance sheet as an asset. They appear on Exhibit 4 as "officer's loan" and total $104,905.54. At least $22,263.46 of this amount represents loans to Larry and Marty, with the balance representing loans to the parents.

The listing of these loans as an asset results in an increase in shareholders' equity and consequently an increase in the value of stock. Therefore, we believe that the loans to the plaintiffs that appear on the balance sheet as an asset must be deducted from the amount awarded them. When we review Exhibit 28, we determine the amount of the deduction from Marty's award to be $11,538.40, and from Exhibit 29 we determine the amount to be deducted from Larry's award to be $10,724.86. The trial court's decree is modified accordingly.

■ In addition, and for the reasons hereafter noted, we believe that the method of payment should be in a manner consistent with the bylaws. The fact that the parties were unable to agree to a valuation should not serve as a basis to avoid the remaining part of the bylaw. We modify the court's ruling accordingly.

We hold the facts and circumstances here require such modification. The method of payment is clear and unambiguous, and the intent of the parties under the bylaw in question is not disputed. For us to change the method of payment from the course agreed to in the bylaw would constitute a rewriting of the agreement of the parties. This, under these circumstances, courts should not do. *See Swanson v. Shockley*, 364 N.W.2d 252, 255 (Iowa 1985).

■ Courts should not rewrite a shareholder agreement under the guise of relieving one of the parties from the apparent hardship of an improvident bargain. *Sorlie v. Ness*, 323 N.W.2d 841, 844 (N.D.1982). We recognize that the bylaw relates to the corporation purchasing the stock while here the stockholders are ordered to do so. But we believe that where the selling stockholder agrees to the method of payment for his stock by way of a bylaw or otherwise, he should not be able to avoid a payment schedule by challenging the value. This is particularly so here where the selling stockholders contributed significantly to the family discord that created the problem in the first instance. Nor do we believe that this rule should be altered merely because the majority shareholders are ordered to buy the stock instead of the corporation. This is so, for although section 496A.94 gives the court the power to relieve minority shareholders from oppressive acts of the majority, courts must be careful when fashioning its relief so that the minority does not gain a foothold that is oppressive to the majority. *See Polikoff v. Dole & Clark Building Corp.*, 37 Ill. App.2d 29, 184 N.E.2d 792, 795 (1962).

■ Finally, the trial court made a finding that a new trustee to manage the pension and profit sharing plans should be appointed. We disagree. The only com-

plaint as to the administration of the profit and pension sharing plans is that the plaintiffs are not allowed to borrow from those plans. But this restriction applies to all members, not just the plaintiffs. We find nothing illegal or oppressive as to this prohibition. We therefore modify the court's ruling accordingly.

We affirm and modify.

AFFIRMED AS MODIFIED WITH DIRECTIONS TO ENTER JUDGMENT CONSISTENT WITH THIS RULING.

DONIELSON, P.J., concurs.

HAYDEN, J., dissents in part.

HAYDEN, Judge (dissenting in part).

I respectfully dissent from that portion of the majority's opinion wherein they determine the trial court should not have appointed a new trustee. I disagree with this determination and would affirm the trial court on this issue. Except for this, I concur with the majority's decision.