Dean O. SCHUMACHER and Sandra L. Schumacher, Plaintiffs and Appellants,

v.

Mary S. SCHUMACHER, as Personal Representative of the Estate of Robert O. Schumacher; Roam's Rentals, a North Dakota General Partnership whose partners are Robert O. Schumacher and Mary S. Schumacher; and Schumacher's of Fargo, Inc., a North Dakota corporation, Defendants and Appellees.

Civ. No. 890180.

Supreme Court of North Dakota.

May 7, 1991.

Vinje Law Office, Fargo, for plaintiffs and appellants; argued by Edmund G. Vinje II. Appearance by Daniel L. Hull.

Morley & Morley, Ltd., and McConn, Fisher, Olson & Daley, Grand Forks, for defendants and appellees; argued by Patrick R. Morley. Appearance by Patrick W. Fisher.

GIERKE, Justice.

Dean Schumacher, and his wife Sandra, appeal from a district court judgment (1) dismissing all claims which were handled by the court as derivative and equitable claims against Mary Schumacher, as personal representative of the estate of Robert O. Schumacher, her deceased husband; Roam's Rentals, a North Dakota general partnership (Roam's); and Schumacher's of Fargo, Inc., a North Dakota corporation (Schumacher's), and (2) providing relief to the parties pursuant to a jury verdict. We reverse the judgment in its entirety and remand for a jury trial on the merits of all issues.

After several years of discussions, Robert and Dean agreed in 1974 to start a Goodyear tire retail and service business in Fargo. In 1975 Roam's, a partnership consisting of Robert and Mary, purchased the

land for the original building for $67,357. The Certificate of Incorporation for Schumacher's was issued by the Secretary of State on April 14, 1976. Robert received 51 shares of stock and Dean received 49 shares. Under the bylaws of the corporation, the four directors of the corporation were Dean, Sandra, Robert, and Mary. Each held an equal voting right on corporate business.

On May 10, 1976, an employment agreement between Dean and Schumacher's was signed. The tire store opened for business on August 1, 1976. Dean was to operate the day-to-day activities of the store for a specified salary and Robert was to act as a consultant, for which he would receive an amount equal to one-third of Dean's salary.

Interim financing for construction of the building and for the business was obtained by Dean and Robert, both signing notes, in amounts of $181,751.64, and $50,000. On May 13, 1977, Robert and Dean closed on the permanent financing for the building with Western States Life Insurance Company in the amount of $252,000. The loan called for monthly payments of $2,349. The loan was secured by a mortgage on the real property and an assignment of all rentals due under a lease between Roam's and Schumacher's. That lease required Schumacher's to make monthly payments to Roam's of $2,450.

Dean thought that he and Robert, individually, were to own the land and building rather than the Roam's partnership. However, Robert informed Dean that under the terms of the lease between Roam's and Schumacher's the land and the building would revert to the corporation at the end of the twenty-year lease term. The lease was signed on behalf of Roam's by Robert and Mary and on behalf of Schumacher's by Robert and Dean.

In 1979, the corporation expanded, and on November 14, 1979, a second lease between Roam's and Schumacher's was signed requiring a monthly rent of $3,695 with an option to purchase after the nineteenth year of the lease term. To finance the additional building construction required by the expansion, Roam's obtained a loan through Western States Life Insurance Company on November 26, 1979, in the amount of $345,500 which required monthly payments of $3,335. The loan was secured by a mortgage and an assignment of lease similar to the previous loan agreement between Western States Insurance Company and Roam's. The November 26, 1979, mortgage satisfied the initial May 13, 1977, mortgage.

On August 24, 1985, the lease was cancelled by Roam's on grounds that Schumacher's had defaulted on real estate taxes and assessments.

The total to be paid to Roam's under the written terms of the leases, through August 24, 1985, the date that Roam's cancelled the lease, was $323,910.15. However, actual lease payments received by Roam's from the corporation for that period totaled $415,387.34. An explanation for these excess payments was that the corporation was making monthly payments of $1,025 to Roam's in order to reimburse Roam's for the cost of acquiring the land on which the building was located. Dean thought that the amount allocated to land payments was part of and included in the monthly lease payments of $3,695. The monthly payment in the sum of $3,695 required by the 1979 lease and the monthly land payment of $1,025 exceeded Roam's monthly mortgage payments for the building and the land by $360 each month.

In addition to the real property, the corporation leased vehicles and equipment through Roam's. In July of 1976, Robert told Dean that most of the leases carried a period of three years. In 1979, the leases were to end. In 1980, Dean became suspicious because, in addition to Robert not allowing him to see the "leases", the rentals being paid to Roam's for equipment and vehicles were not significantly reduced, as Dean believed would be consistent with the status of terminated leases. Following the court trial on this case, Judge Garaas found that the leases were actually month-to-month leases rather than three-year leases. Testimony adduced at trial was that the monthly lease payments were considerably higher than should have been for

three-year leases. An expert at trial testified that the payments by the corporation on the nine lease transactions between the corporation and Roam's for vehicles and equipment exceeded the amount a leasing company would have charged for three-year leases by $34,421.31.

In 1983, the corporation changed its banking from First Bank to Dakota Bank. Dakota Bank was willing to take over as the bank for the corporation if Dean and Robert personally guaranteed all the loans to the corporation. Dakota Bank loaned the corporation $217,000. In signing the documents for this loan, Dean asserts that he unknowingly signed a pledge agreement, pledging his 49 shares of stock in Schumacher's to Robert if the corporation defaulted on the $217,000 promissory note and the bank collected more than 51% of the unpaid balance from Robert. Schumacher's executed a security agreement with Dakota Bank pledging as security all equipment, inventory, accounts and contract rights in consideration for the loan. Additionally, Dean and Robert signed unlimited personal guaranties to Dakota Bank. On January 19, 1984, Dakota Bank loaned the corporation an additional $25,-000.

The corporation showed a net profit in 1976, 1978, and 1979. However, in 1977 and during the period from 1980 through 1984 the corporation showed a net loss and a deteriorating financial picture. On March 28, 1984, Robert and Dean met to discuss the future of the struggling corporation. They agreed that Robert would buy Dean out of the business, effective April 1, 1984. However, there was apparently no agreement made as to the buy-out price of Dean's share in the corporation.

Upon arriving at the store on April 2, 1984, Dean discovered that the building locks had been changed. Three days later Robert sent Dean a letter stating that his employment as General Manager had been terminated as of the close of business on March 31, 1984. The letter further stated that determinations of the assets and liabilities of the corporation as of March 31, 1984, for the purposes of arriving at the net financial worth of the corporation would be made and an evaluation of the property at fair market value would be made where appropriate. Dean was never paid for his interest in the corporation.

On April 24, 1984, Robert informed Dean that his medical and other insurance coverage was being terminated as well as his use of a company vehicle. On July 1, 1984, Goodyear terminated Schumacher's line of credit. The corporation underwent further credit and financial problems. On September 7, 1984, Dakota Bank mailed a letter to Robert and Dean advising them that the corporate note was ten days past due. Subsequently, Dakota Bank wrote several letters to both Robert and Dean advising them of their unlimited personal guaranties on the past due note. On November 9, 1984, Dakota Bank wrote a letter to Robert and Dean advising them, once again, of their unlimited personal guaranties and informing them that they would be looking for payment from each of them with regard to the loans made to the corporation which were past due in an amount exceeding $200,000.

On November 15, 1984, a special meeting of the Board of Directors was held. At the meeting, Dean stated that he wanted the corporation to close its business operations and find a new tenant so the corporation could keep current with the real estate lease payments to Roam's, and ultimately have an opportunity to exercise its favorable option to purchase the real estate. This motion failed, because Robert voted against it.

Subsequently, on November 29, 1984, Roam's sent a letter terminating the lease with the corporation. The basis for the termination was that Schumacher's had failed to pay the 1983 real estate taxes and assessments against the real estate as required under the lease. However, Roam's allowed the corporation to continue leasing on a month-to-month basis.

Robert personally paid the entire Dakota Bank obligation in the amount of $222,-429.27 on November 29, 1984. Dean made no part of this payment, nor has he ever made any payment to Dakota Bank for

debts incurred through the corporate operation. Upon receipt of the debt obligation payment from Robert, Dakota Bank assigned Dean's personal guaranty to Robert, the $217,000 note to Robert, the Schumacher's security agreement to Robert, and Roam's security agreement to Robert.

On December 5, 1984, Dean wrote to Robert stating "[a]s a shareholder, director and officer of Schumacher's of Fargo, Inc. I can see no benefit in continuing with a business that is losing money. Therefore, I once again demand that the business be closed. It does not appear to be in the best interest of the shareholders to continue a losing operation. It is not prudent for you as an officer, director and shareholder to continue a losing business."

Dean and Sandra commenced this action against Robert, Roam's, and Schumacher's claiming, among other things, breach of an employment contract, breach of a promise to purchase stock, failure to pay promissory notes, fraud, deceit, breach of fiduciary duty, and infliction of emotional distress. They sought relief including compensatory damages, exemplary damages and an implied trust on certain stock and real estate. Robert and the corporation counterclaimed for damages, alleging that Dean had converted corporate funds and that Dean was indebted to Robert for paying the debt obligation to Dakota Bank that both Dean and Robert had personally guaranteed.

Robert died in 1985, and his estate, Schumacher Tire Center, Schumacher Tire Service, Inc., and Roam's wrote a letter to Dean advising him that the real estate lease which was then claimed to be on a month-to-month basis was being terminated, that Robert's estate held perfected security interests by assignment to Robert from Dakota Bank, and that all assets of Schumacher's had been foreclosed upon.

Upon cancellation of its lease, Schumacher's ceased doing business on August 23, 1985. A new corporation was immediately formed by Mary called Schumacher's S.E., Ltd. It became owner of the assets of Schumacher's, and it has operated a tire business continuously at the same location since August, 1985. Dean was never paid for his interest in the corporation.

The trial court granted the defendants' motions for severance of legal and equitable claims. Claims determined by the court to be derivative equitable claims were tried to the court before the legal issues were tried before a jury. The trial by the court was held from January 18 through January 22, 1988. The trial court determined that the derivative issues involved alleged excessive lease payments by the corporation and receipt of excessive management fees by Robert. The trial court also considered Dean and Sandra's claims that Robert wrongfully acquired Dean's stock pledge for which they sought to void the pledge, or in the alternative, to impose an implied trust on the stock. The court also considered their claim for an implied trust on the real estate. At the conclusion of the bench trial, the trial court, pursuant to Rule 41(b) N.D.R.Civ.P., dismissed all of these claims on their merits.

Prior to the jury trial, the judge who sat on the bench trial retired. The case was assigned to a different judge, who issued an order limiting the jury trial to eight issues. The court granted defendants' motion for a directed verdict, dismissing Dean's claim for breach of Robert's promise to pay Dean for his interest in the corporate stock and dismissing the claims against Roam's. The court also dismissed the claim for punitive damages against Robert's estate. The other claims went to the jury.

By special verdict, the jury found as follows: (1) that the corporation had breached its employment contract with Dean and that Dean had been damaged by such breach in the amount of $200,000; (2) that Robert and the corporation had not intentionally inflicted severe emotional distress upon Dean; (3) that Robert, the corporation, and Dean negligently inflicted severe emotional distress upon Dean, with negligence attributable 15% to Robert, 15% to the corporation, and 70% to Dean, and that Dean was damaged in the sum of $30,000 by such negligence; (4) that Dean loaned

money to the corporation for which he is entitled to be paid $70,106.03; (5) that Dean is entitled to receive punitive damages of $100,000 against the corporation as a result of the conduct of Robert; (6) that Dean did not improperly divert funds to himself from the corporation for his own use; (7) that Dean is obligated to reimburse Robert's estate the sum of $91,571.40 for Dean's personal liability on the debts of the corporation paid by Robert.

On appeal, Dean and Sandra allege numerous errors in the lower court proceedings. Unfortunately, this case has been made more complex than necessary because of the shotgun approach which the plaintiffs used in framing the issues. However, the dispositive issues upon which this appeal is focused are: (1) that the trial court erred in ordering that some of the claims must be tried before the court in a derivative action on behalf of the corporation and not as direct claims against the defendants, and (2) that the trial court erred in ordering that Dean and Sandra's derivative and equitable claims be resolved by the court prior to the jury trial involving their legal claims.

The limited market for stock in a close corporation and the natural reluctance of potential investors to purchase a non-controlling interest in a close corporation that has been marked by dissention can lead to situations where the majority or controlling shareholders "freeze out" minority shareholders by the use of oppressive tactics. *Balvik v. Sylvester*, 411 N.W.2d 383, 386 (N.D.1987). For example, the majority or controlling shareholders may refuse to declare dividends, may grant majority shareholders-officers exorbitant salaries and bonuses, or may pay high rent for property leased from the majority shareholders. As we recognized in *Balvik, supra,*

> "Freeze-outs are actions taken by the controlling shareholders to deprive a minority shareholder of her interest in the business or a fair return on her investment.... If the minority shareholder is employed by the corporation full time, as is typical, and if she relies on her salary as her primary means of obtaining a return on her investment, as is typical,

she is suddenly left with little or no income and little or no return on her investment. The controlling shareholders may effectively deprive the minority shareholder of every economic benefit that she derives from the corporation. Meanwhile, the controlling shareholders may continue to receive a substantial return based on their continuing employment with the corporation. The minority shareholder's investment serves only to insure the success of the corporation for the benefit of the controlling shareholders."

We held in *Balvik, supra,* that majority stockholders in close corporations must discharge their management and stockholder responsibilities in conformity with the utmost of good faith and loyalty in the operation of the enterprise, and " 'may not act out of avarice, expediency or self-interest in derogation of their duty of loyalty to the other stockholders and to the corporation.' " *Balvik, supra,* 411 N.W.2d at 387 (quoting *Donahue v. Rodd Electrotype Co. of New England, Inc.,* 367 Mass. 578, 328 N.E.2d 505, 515 (1975). We also held that a minority shareholder who has been "frozen out" or otherwise harmed by a breach of fiduciary duty by the majority shareholders is entitled to appropriate relief.

Although Dean and Sandra's action is premised upon numerous theories of recovery, including claims of breach of contract, fraud, deceit, and negligence, the gravamen of their action is breach of fiduciary duty by a majority or controlling shareholder of a closely held corporation toward the minority shareholders. Over Dean and Sandra's objection, the trial court required them to try before the court, and not a jury, several of their claims as equitable derivative claims, on behalf of the corporation, instead of direct personal claims against the defendants. Claims treated by the court as derivative claims involved allegations of excess lease payments and of excess management fees paid by the corporation to Robert. After a bench trial, the trial court ultimately dismissed all of these claims on their merits. On appeal, Dean and Sandra assert that the trial court erred

in requiring them to try these issues as derivative claims and also erred in having all "equitable" claims tried before the court prior to the jury trial of their legal claims.

■ As a matter of general corporate law, shareholders alleging injury to the corporation must bring an action on behalf of the corporation within the context of a derivative action. *See Cunningham v. Kartridg Pak Co.*, 332 N.W.2d 881 (Iowa 1983).

One well respected treatise in the area of close corporations, O'Neal & Thompson, O'Neal's Close Corporations § 8.11, pages 119, 122 (3rd ed.), recognizes that when dealing with a close corporation the determination of whether an action must be brought as a direct or derivative suit is difficult and also recognizes problems in requiring a minority shareholder to bring a derivative action:

> "A derivative suit permits a shareholder to sue on behalf of the corporate entity to remedy or prevent a wrong to the corporation. A derivative action is an exception to the usual rule that a corporation's board of directors manages it or supervises its management and thereby controls its decisions.

> \*    \*    \*    \*    \*    \*

> "Even if a minority shareholder overcomes procedural hurdles in a derivative action, a strong disadvantage is that any recovery accrues to the corporation and hence remains under the control of the very parties who may have been defendants in the litigation.... [S]ome courts permit oppressed minority shareholders to bring direct suits for breaches of fiduciary duties the majority shareholders owe minority shareholders even though the plaintiffs' grievance is based primarily on damage to the corporation. Courts need not ignore the reality that the litigation is really a dispute among shareholders."

■ A well-recognized exception to the rule that a shareholder must bring a derivative action for claims alleging injury to the corporation is that in a closely held corporation a minority shareholder may bring a direct action, rather than a derivative action, if the shareholder alleges harm to himself distinct from that suffered by other shareholders of the corporation or breach of a special duty owed by the defendant to the shareholder. *Cunningham v. Kartridg Pak Co.*, 332 N.W.2d 881 (Iowa 1983); *see also Thomas v. Dickson*, 250 Ga. 772, 301 S.E.2d 49 (1983); *Russell v. First York Savings Co.*, 218 Neb. 112, 352 N.W.2d 871 (1984), *overruled on other grounds in Van Pelt v. Greathouse*, 219 Neb. 478, 364 N.W.2d 14 (1985); *Crosby v. Beam*, 47 Ohio St.3d 105, 548 N.E.2d 217 (1989); *Horizon House-Microwave, Inc. v. Bazzy*, 21 Mass.App. 190, 486 N.E.2d 70 (1985).

■ The focus of the plaintiff's action in *Crosby v. Beam, supra,* like that of Dean and Sandra's action in this case, involved breach of fiduciary duty by the majority shareholders toward the minority shareholders. The Supreme Court of Ohio held that claims of a breach of fiduciary duty alleged by minority shareholders against controlling shareholders in a close corporation may be brought as an individual or direct action rather than a derivative action. It explained:

> "Where majority or controlling shareholders in a close corporation breach their heightened fiduciary duty to minority shareholders by utilizing their majority control of the corporation to their own advantage, without providing minority shareholders with an equal opportunity to benefit, such breach, absent a legitimate business purpose, is actionable. Where such a breach occurs, the minority shareholder is individually harmed. When such harm can be construed to be individual in nature, then a suit by a minority shareholder against the offending majority or controlling shareholders may proceed as a direct action." *Crosby v. Beam, supra,* 548 N.E.2d at 221.

The American Law Institute, in the latest draft of its *Principles of Corporate Governance: Analysis and Recommendations,*

Tentative Draft No. 11, (April 25, 1991) § 7.01(d),[1] recognizes the circumstances under which an individual may bring a direct, rather than derivative action:

> "(d) If a corporation is closely held [§ 1.03b], the court in its discretion may treat an action raising derivative claims as a direct action, exempt it from those restrictions and defenses applicable only to derivative actions, and order an individual recovery, if it finds that to do so will not (i) unfairly expose the corporation or the defendants to a multiplicity of actions, (ii) materially prejudice the interests of creditors in the corporation, or (iii) interfere with a fair distribution of the recovery among all interested persons."

The prerequisites to permitting a direct action are present in this case. A direct action would not unfairly expose the defendants or the corporation to multiple actions because the corporation and all shareholders are parties to this action. Likewise, permitting Dean and Sandra to bring a direct action could not interfere with a fair distribution of a recovery because all interested persons are parties to this action. In addition, the record is completely devoid of any indication that there are corporate creditors whose interests could be materially prejudiced by allowing a direct action in this case.

■ The ultimate question is whether the trial court's refusal to allow Dean and Sandra to bring a direct action constituted an abuse of the court's discretion. We conclude that under the circumstances of this case the trial court did abuse its discretion. Not only did the court refuse to permit a direct action, but it required Dean and Sandra to try the derivative claims to the court prior to holding a jury trial on the other issues. In deciding the derivative claims the trial court made findings of fact about whether Robert had breached his

fiduciary duty to the minority shareholders or had committed fraud or deceit. These are questions that should have been presented to the jury in disposing of the other claims in the case. Questions about whether one has breached a fiduciary duty or has acted without good faith require weighing the credibility of witnesses and sifting through competing and conflicting versions of what occurred and what state of mind each actor brought to the occurrence, questions which "are all emphatically matters for the jury." *Froemming v. Gate City Federal Savings & Loan Association*, 822 F.2d 723, 731 (8th Cir.1987). A trial court cannot deprive a litigant of the right to a jury trial by resolving an equitable claim before the jury hears a legal claim raising common issues. *See Lytle v. Household Mfg., Inc.*, 110 S.Ct. 1331, 494 U.S. 545, 108 L.Ed.2d 504 (1990).

We made it clear in *Landers v. Goetz*, 264 N.W.2d 459, 463 (N.D.1978), that legal issues must generally be tried before equitable issues are decided by the court:

> "It is the general rule that legal issues entitling a party to a jury trial should be tried to the jury prior to the disposition of the equitable issues triable to the court. Whenever the issues are so interrelated that a decision in the nonjury portion might affect the decision of the jury portion, the jury portion is to be tried first, since otherwise the party entitled to the jury trial would be deprived of part or all of his right to a jury trial."

In reviewing the record before us, we can find no reason to depart in this case from the rule that the jury must be allowed to decide the legal issues before the trial court can dispose of any remaining equitable issues triable to the court. By standing this rule on its head, the trial court deprived Dean and Sandra of a full and fair determination by a jury of whether they, as minority shareholders, were the

---

1. Although we find this black letter statement of law to be persuasive, we caution that under the bylaws of the American Law Institute, no statement can be published as representing the position of the Institute unless it has been authorized by the membership of the Institute and approved by the Council. It is our understanding that, as of this date, the quoted section has not been officially authorized or approved.

victims of wrongdoing and of breaches of fiduciary duty by Robert, the majority shareholder. We conclude, therefore, that the trial court abused its discretion in refusing to permit Dean and Sandra to bring a direct action on all claims and in deciding the claims for equitable relief prior to holding the jury trial.

This case is distinguishable from *Kopperud v. Reilly,* 453 N.W.2d 598 (N.D.1990), and *Lithun v. Grand Forks Public School,* 307 N.W.2d 545 (N.D.1981), in which we held that a party is not entitled to a jury trial when the claim for damages is incidental to and dependent upon that party's equitable claim. In this case Dean and Sandra are primarily seeking damages for breach of fiduciary duty and other alleged wrongdoings by a majority shareholder. If Dean's pledge of stock to Robert was found to be valid, Dean and Sandra requested that the court impose an implied trust on Dean's stock for reasons other than the invalidity of the pledge. Dean and Sandra also requested that an implied trust be imposed on the real estate held by the Roam's partnership. These requests for equitable relief are incidental to and dependent upon Dean and Sandra's legal claims for damages. Dean and Sandra's request for incidental equitable relief should not subvert their right to a full and fair jury trial nor their right to have their legal issues determined by a jury prior to the court's disposition of their request for equitable relief.

■ The issues and claims raised in this case are not only complex, they are also inextricably intermingled. The plaintiffs' assertions that the defendants committed breaches of contract, fraud, deceit, negligent infliction of emotional distress and various other wrongdoings toward the plaintiffs are all interrelated. They are part of the central question of whether Robert, as majority shareholder, breached his fiduciary duty toward the plaintiffs. Where issues in a case are so intertwined or the error below permeates the entire case, it is appropriate to reverse and re-mand for a trial of all issues anew. *See Irgens v. Mobil Oil Corp.,* 442 N.W.2d 223 (N.D.1989); *Northern Pacific Railway Co. v. Morton County,* 131 N.W.2d 557 (N.D. 1964).

We conclude that the jury, not the trial court, should have been given the first opportunity to hear this case. We further conclude that justice can best be served by reversing the entire judgment and remanding for a new trial of all issues. Dean and Sandra must be allowed to present their claims as a direct action against the defendants, and the jury must be allowed to decide disputed fact issues unhampered by preemptive trial court findings on those issues or on fact questions that are unavoidably interrelated and intertwined with the issues before the jury. If, following the jury trial, there remain viable equitable issues or unresolved requests for equitable relief, the trial court can then rule on those matters, having had the benefit of the jury's determination on the related factual questions.

Our resolution of this case makes it unnecessary to resolve other issues raised by the parties which are not certain to reoccur.

In accordance with this opinion the judgment of the trial court is reversed in its entirety and the case is remanded for a trial on the merits of all issues in the case.

ERICKSTAD, C.J., and VANDE WALLE, LEVINE and MESCHKE, JJ., concur.