Glenda Sue MARTIN, Plaintiff
and Appellant,

v.

Lynn T. MARTIN, Defendant
and Appellee.

Civ. No. 890152.

Supreme Court of North Dakota.

Jan. 25, 1990.

Farhart, Lian, Maxson, Howard & Sorensen, PC, Minot, for plaintiff and appellant; argued by Judith E. Howard.

McGee, Hankla, Backes & Wheeler, Ltd., Minot, for defendant and appellee; argued by Donald L. Peterson.

MESCHKE, Justice.

Glenda Sue Martin appealed from a divorce decree awarding her support and dividing property. We affirm the property division, the finding that Sue is employable, and her support award. We reverse termination of her support at age 65. We remand for determination of attorney's fees on appeal.

Sue and Lynn T. Martin were married in 1957, when Sue was 19 and Lynn 21. After their honeymoon, Sue and Lynn lived on and farmed the Kivley land, her parent's farmstead. In 1972, they purchased the Kivley land from Sue's parents.

Sue's formal education ended after 1 year of college; Lynn's after high school. Lynn was healthy, while Sue suffered from cerebral arterial ventrical malformation (a tangled pool of blood vessels). From this congenital and inoperable condition, Sue experienced "epileptic-like seizures," headaches, and fear of paralysis or death. Although Sue took medication, she was unable to control her seizures and had recent-

ly been restricted in her exercise program. Sue did not have a driver's license.

Despite her health, Sue raised their four children, now adults; did all the housekeeping; tended a vegetable garden, freezing and canning the produce; baked and cooked; and had kept all the records and prepared all the reports for the farm. Additionally, in 1959, Sue used an inheritance to finance part of the material cost of their new house which her parents helped them build. In 1985, after Sue and Lynn separated, the house burned down. Sue used most of the insurance proceeds to rebuild on their farmstead.

In 1985, Lynn left the farmstead and moved to Minot but continued to operate the farm. Sue stayed on the farmstead and, in 1987, sued for divorce. The trial court granted the divorce, divided their property, and awarded support to Sue.

Mineral rights and patronage credits were divided equally. The farm, including the Kivley land as well as all equipment, grain and cattle, was awarded to Lynn. Thus, Lynn received virtually all of the marital property, valued at $696,905, subject to all marital indebtedness of $517,553. To evenly divide the $189,893 net marital estate, the trial court gave Sue $8,276 of goods in her possession, ordered Lynn to pay her $10,000 within 60 days, and ordered Lynn to pay her $76,671 amortized over 10 years at 12% interest. To secure the monetary award, the trial court imposed a lien on the real estate distributed to Lynn "subject to the rights of existing lien holders."

The trial court determined that Sue was employable and could help support herself, but ordered Lynn to pay Sue $500 per month support until she remarried, died, or reached age 65. Lynn was ordered to pay $1,000 toward Sue's legal fees.

On appeal, Sue questioned the fairness of the property division, the finding that she was employable, the adequacy of her support, and the termination of her support at age 65. She also sought attorney's fees for the appeal.

## PROPERTY

The trial court divided the net marital estate equally by setting aside the farm and the debt to Lynn and by making an offsetting monetary award to Sue. On appeal, Sue challenged this division as clearly erroneous.

Sue assembled a slew of reasons: Most of their farm, the Kivley land, came from her family and was her lifetime home. Her health was poor and she was over 50. She had never been employed outside the home. She claimed that her deferred monetary buyout would be consumed by her normal living expenses leaving her without a safety net in her old age. Sue accused Lynn of "less than honorable" conduct "in willingly supporting a live-in girlfriend and her son" after Lynn and Sue separated. For these reasons, Sue argued that she should have a good deal more than half of the property. Sue asked for the Kivley land and 2 additional quarters of pasture, valued at $377,-600 and subject to a mortgage indebtedness of $195,000. Thus, Sue wanted nearly all of the net marital estate.

Lynn argued that the trial court made an equal division because they had equally earned the marital property. Lynn also argued that his lack of retirement savings left him no better off than Sue in facing old age. Having shouldered all the farm debt together with the debt of the monetary distribution to Sue, a total debt of over $600,000, Lynn depicted his own bleak prospects.

The trial court thoughtfully weighed Sue's needs and connections to the farmstead, Lynn's abilities and plans to continue farming, and the large debt on the farm. A sale of the farm was rejected as "the least desirable alternative." A "direct distribution of farmland to Sue" had too many drawbacks. The trial court determined that "[s]uch a plan would raise questions about the rights of secured creditors and would impair Lynn's remaining farm operation as an economic unit." The trial court reasoned:

> I have given serious consideration to allowing Sue to remain on the farm. She has strong ties to the farm residence.

However, my experience supports Lynn's contention that allowing both parties to share any part of the farmstead would create a continuing course of conflict.

The trial court determined that the most workable division was to award the farm to Lynn and to make an offsetting monetary award to Sue. Since "each has made a significant contribution toward the marital estate," the trial court concluded that "there is no reason why Sue and Lynn should not share equally...."

After they separated, Lynn and Sue were each involved with persons of the opposite sex in ways that did not significantly affect the net marital estate. As we remarked in a similar situation, "[w]e do not believe that the trial court gave insufficient consideration to the origination of the farmland, especially in view of the fact that the property was acquired by purchase and not as a gift or inheritance." *Erickson v. Erickson*, 384 N.W.2d 659, 661 (N.D.1986). Without a determination of serious marital misconduct or economic waste by one spouse, we cannot direct substitution of an unbalanced division to the other spouse of property acquired during a long-term marriage. *See Erickson v. Erickson*, 384 N.W.2d 659 (N.D.1986); *Bader v. Bader*, 448 N.W.2d 187 (N.D.1989). We are not convinced that a mistake was made in this division.

■ Generally, if evidence supports the trial court's division of property, it is not clearly erroneous under NDRCivP 52(a). *Roen v. Roen*, 438 N.W.2d 170, 171 (N.D. 1989); *Behm v. Behm*, 427 N.W.2d 332, 337 (N.D.1988). We conclude that this property division was not clearly erroneous.

### SUPPORT

In setting permanent support for Sue of $500 per month, the trial court determined that she was employable and thus able to contribute to her own support.

On appeal, Sue asserted that, since her poor health and resultant seizures were unrefuted, the trial court should have found her unemployable. She also submitted that her employment was impracticable without a driver's license. From these premises, Sue argued that finding her employable was a mistake.

Lynn countered that no medical expert had said that Sue was unable to work nor had she unsuccessfully sought work. He argued that Sue was intelligent, able to interact well within the community, and had bookkeeping skills which would hold her in good stead in the work world.

■ The trial court determined that "[a]lthough Sue has experienced some medical problems, it would appear that she is employable. Sue's limited education and work experience off the farm would likely qualify her for little more than minimum wage employment." Thus, the trial court took her health condition into account and cautiously assessed her "ability to earn a modest income at minimum wage." We are not convinced that a mistake was made. Therefore, we affirm the trial court's finding that Sue was employable.

■ Sue challenged the sufficiency of the support awarded to her. The trial court found:

A significant part of Lynn's ability to produce income is attributable to capital as well as labor. Sue's earning potential must also include income attributable to her share of the distributed marital estate. Assuming a return of 10%, Sue's distribution should produce $715.00 per month. A 12% return would result in $860.00 monthly. Although I agree that Sue is entitled to permanent alimony, because of the factors just considered, she does not require the $1,600.00 per month requested.

Assuming the ability to earn a modest income at minimum wage and further assuming a reasonable return on capital, Sue will still be in need of spousal support. Because of the limited number of remaining productive years, any meaningful re-training probably could not be accomplished. I find that Sue should receive alimony of $500.00 per month payable until her remarriage, death, or until she attains age 65, whichever is the first to occur.

Under these circumstances, the support award of $500 per month to Sue was not inadequate or clearly erroneous. NDRCivP 52. Therefore, we affirm the amount.

■ Sue questioned termination of her permanent support at age 65. Since she would need support even if employed, Sue claimed that it was incorrect to end it at age 65. She cited a long line of decisions approving spousal support for life when a disadvantaged spouse could not be satisfactorily rehabilitated to maintain a comparable standard of living. *Nastrom v. Nastrom*, 284 N.W.2d 576 (N.D.1979); *Gooselaw v. Gooselaw*, 320 N.W.2d 490 (N.D. 1982); *Mees v. Mees*, 325 N.W.2d 207 (N.D. 1982); *Briese v. Briese*, 325 N.W.2d 245 (N.D.1982); and *Roen v. Roen*, 438 N.W.2d 170 (N.D.1989). Sue contended that it was wrong to schedule the ending of her "permanent" support at a time when she should ordinarily be able to retire and not have to work.

Lynn argued that the trial court weighed Sue's needs at 65 with his ability to pay, suggesting that he would be less able to pay support after his own retirement. However, we believe that this argument overlooked the fact that the great bulk of income producing assets were distributed to Lynn, thus giving him a greater potential of savings for retirement.

Indefinite support is merited when "a spouse ... cannot be adequately restored to independent economic status." *Roen*, 438 N.W.2d at 172. This record reflects no change in Sue's status at age 65 which would negate her needs. If she works, Sue may be able to save and reinvest her monetary distribution in order to help after retirement. But the trial court did not disclose why it thought Sue would be able to fully provide for herself after age 65. And, there was neither evidence nor a finding about the potential offsetting effect of social security, if any. *See Olson v. Olson*, 445 N.W.2d 1 (N.D.1989). Since we do not understand the reason for scheduling Sue's support to end at age 65, we reverse that provision without disturbing the direction that support terminate at her remarriage or death.

## ATTORNEY'S FEES

Sue sought an award of attorney's fees for this appeal, pointing out that Lynn had received all the income producing assets and that she was not employed. Lynn suggested that the trial court could determine attorney's fees for this appeal on remand.

■ The trial court and this court have concurrent jurisdiction to award attorney's fees for an appeal in a divorce. NDCC 14-05-23. We prefer that the trial court determine the amount of attorney's fees for a spouse on a divorce appeal. *Roen*, 438 N.W.2d at 174. Therefore, we remand to the trial court for an award of attorney's fees to Sue for this appeal.

ERICKSTAD, C.J., and LEVINE, VANDE WALLE and GIERKE, JJ., concur.