Vikki R. HELEY, Plaintiff
and Appellant,

v.

Larry H. HELEY, Defendant
and Appellee.

Civ. No. 930016.

Supreme Court of North Dakota.

Sept. 29, 1993.

John Bullis (argued) and Tracy Lindberg (appearance), Lies, Bullis, Grosz & Lindberg, Wahpeton, for plaintiff and appellant.

Mark Andrew Meyer (argued), Wahpeton, for defendant and appellee. Appearance by Larry H. Heley, appellee.

NEUMANN, Justice.

Vikki R. Heley appealed from a November 1992 amended judgment granting her a divorce from Larry H. Heley. We agree with her assertion that the trial court erred in matters involving property distribution, spousal support, and child support. Accordingly, we reverse and remand for further proceedings.

Vikki and Larry were married in 1975, and had five children: Derryn James, born in 1976; Marisa Joy, born in 1980; Heather Marie, born in 1981; Jordan Michael, born in 1985; and Ryan Patrick, born in 1987. Upon the parties' stipulation, the trial court award-

ed Vikki and Larry joint legal custody of the children, placing physical custody of Derryn with Larry and of the four younger children with Vikki. At the time of the divorce trial, both Vikki and Larry were 40 years old.

Neither party obtained a post-high school education. Larry grew up farming with his father and has been a farmer all of his life. Vikki worked for three years prior to the marriage as a babysitter, secretary, store clerk, bar maid, and as a laborer in a plant nursery and in a nursing home. She did not work outside of the home during the parties' 17–year marriage. The trial court found that Larry was "verbally and physically abusive" to Vikki during the marriage which resulted in a six-month separation in the late 1980s. The parties underwent counseling, but, the trial court found, since their "reconciliation they continued to have problems although physical abuse was not one of them."

During the latter part of the marriage, the family lived in an $82,000 house they had built in 1987 on a quarter section of land owned by Larry's father. The parties received the income from this land during the marriage but made only two rent payments to Larry's parents. They also owned other real property which they farmed. The trial court found that a "substantial portion of the parties' income and assets were attributable to the free use of the quarter of land of [Larry's] father."

The court valued the couples' assets at $329,981 and their debts at $124,050. The debts included $50,300 remaining in unpaid, interest-free loans Larry's father had advanced the couple during the marriage. This money was used for construction of the house and acquisition of real estate. The couple's payments on these loans were sporadic during the marriage. After the divorce proceedings were started, Larry began paying his father $500 per month on this debt and executed an unsecured promissory note to his father that was "payable upon demand." The remainder of the debts consisted of money owed to the Federal Land Bank. The trial court subtracted the debts, as well as $7,000 in property Larry "brought into the marriage," from the total assets and found

the net value of the parties' property to be $198,931.

The court distributed the property as follows:

"a.	[Vikki] shall be awarded the household goods of $3,700.00. [Vikki] shall also be awarded the 1984 Mercury worth $4,500.00 and be allowed to keep whatever cash remains of $4,450.00.

"b.	[Larry] shall receive all of the real estate and the homestead of the parties valued at $225,505.00; the machinery, equipment and trucks valued at $19,400.00; the toy tractor collection of $800.00; the remaining motor vehicles of $3,200.00; the remaining cash accounts of $4,394.00; the futures account of $7,000.00; crop and feed of $40,400.00; feeder pigs of $14,800.00; and the life insurance policy with a cash value of $1,832.00. [Larry] shall also be liable for the debt to the Federal Land Bank which has a net amount of $73,750.00 and the debt to his father of $50,300.00.

"c.	[Larry] shall pay [Vikki] $315.00 immediately, and $90,000.00 in equal monthly installments with interest at the rate of 8% per annum amortized over a period of 20 years. The payments will be approximately $752.80 per month. [Larry] shall have the right to prepay at any time. [Vikki] shall have a lien for the balance owed to her, by [Larry], on the three pieces of real estate awarded [Larry] and titled in his name."

Larry estimates that this distribution results in $102,965 being awarded to Vikki and $92,096 being awarded to himself. The trial court did not order Larry to pay spousal support for Vikki, except "$1,200 spousal and child support to Vikki for the month of November. The first installment on the property settlement shall start December 1, 1992."

Based on income tax returns for the past five years, the trial court found that Larry had an average monthly income of $2,921 per month after state and federal income taxes were deducted and appreciation added to the adjusted gross income. The trial court then deducted monthly principal payments of $500 to Larry's father and $311 to the Federal Land Bank to arrive at an average net

monthly income of $2,088. The trial court ordered Larry to pay $504 per month for support of the four youngest children. The court further ordered that each party pay their own attorney fees. Vikki appealed.

## PROPERTY DIVISION

A trial court's determinations on matters of property division are treated as findings of fact and will not be set aside on appeal unless they are clearly erroneous under NDRCivP 52(a), or they are induced by an erroneous conception of the law. *Anderson v. Anderson,* 368 N.W.2d 566, 568 (N.D.1985). When a divorce is granted, NDCC § 14–05–24 requires the trial court to distribute the parties' real and personal property as may seem just and proper. In doing so, the trial court must consider all of the real and personal property accumulated by the parties as part of their marital estate, regardless of the source. *Freed v. Freed,* 454 N.W.2d 516, 520 (N.D.1990). It is within the discretion of the trial court, after hearing the testimony and applying the *Ruff–Fischer* guidelines, *see Fischer v. Fischer,* 139 N.W.2d 845 (N.D.1966) and *Ruff v. Ruff,* 78 N.D. 775, 52 N.W.2d 107 (1952), to determine an equitable distribution of the property depending on the facts and circumstances in each individual case. *Zander v. Zander,* 470 N.W.2d 603, 605 (N.D.1991); *Routledge v. Routledge,* 377 N.W.2d 542, 549 (N.D.1985). A property division need not be equal to be equitable, but a substantial disparity should be explained. *Spooner v. Spooner,* 471 N.W.2d 487, 491 (N.D.1991). We are definitely and firmly convinced that a mistake has been made in the manner of distributing the marital property to Vikki in this case.

First, we agree with Vikki that the trial court erred in excluding from the marital estate, prior to distribution, Larry's $7,000 worth of "pre-marital property." This $7,000 is property Larry "brought into the marriage" and consists of the balance in savings and checking accounts on the date of the marriage and the value of a car he bought prior to the marriage. We have often said that property acquired prior to the marriage by one spouse should be considered as part of the marital estate in determining an equi-

table division. *E.g., Gronneberg v. Gronneberg,* 412 N.W.2d 84, 92 (N.D.1987). "[S]eparate property, whether inherited or otherwise, must initially be included in the marital estate and is subject to distribution as may be necessary to achieve an equitable distribution." *Anderson,* 368 N.W.2d at 568. Although the premarital acquisition of property can be considered in distributions under the *Ruff–Fischer* guidelines, we have "never decreed that the property brought into a marriage by a party be irrevocably set aside to that party, ..." *Freed,* 454 N.W.2d at 521–522. It seems particularly inappropriate here, where the so-called "pre-marital assets" have been commingled over a 17–year marriage, and no longer have any separate identity. The trial court misapplied the law by excluding this $7,000 in pre-marital property from the value of the distributable marital estate.

We disagree with Vikki, however, that the trial court erred in not awarding her immediate title to one-half of the real property owned by the parties, and that the trial court improperly computed the value of her award. We have previously upheld distribution of farms or other business assets to one spouse with an offsetting monetary award to the other spouse. *See, e.g., Martin v. Martin,* 450 N.W.2d 768, 769–770 (N.D.1990); *Linn v. Linn,* 370 N.W.2d 536, 543 (N.D. 1985). This type of property distribution alleviates reducing the farmer or business person's ability to successfully operate the enterprise as an economic unit, which would effectively work a disadvantage to both spouses, and avoids the course of conflict that would likely arise if divorced spouses continued to effectively share ownership of a farm or business. *See Martin; Linn.* As to the value of the award, the trial court's requirement that Larry pay Vikki $90,000 over a period of 20 years also included interest at the rate of 8%. Because the amortized payments include interest on the $90,000, it is not necessary to reduce the $90,000 to a present value in order to determine the true worth of the award. *Compare Lucy v. Lucy,* 456 N.W.2d 539 (N.D.1990), and *Tuff v. Tuff,* 333 N.W.2d 421 (N.D.1983), in which no interest was ordered. Nor was the interest

improperly added to the $90,000 in computing the value of Vikki's share of the property distribution. *Compare Kitzmann v. Kitzmann,* 459 N.W.2d 789 (N.D.1990).

If we were to view the value of the assets awarded to each party purely in a vacuum, we would have no difficulty concluding that the division of property was not clearly erroneous. But we cannot consider the property distribution alone, without considering other factors in this case. We have said that "property distribution and spousal support often need to be examined and dealt with together." *Pfliger v. Pfliger,* 461 N.W.2d 432, 436 (N.D.1990). The trial court, without explanation, did not award spousal support. The trial court's failure to award spousal support, considered together with the manner and type of property distributed to each party, requires that this case be remanded for further proceedings.

## SPOUSAL SUPPORT

In *Sateren v. Sateren,* 488 N.W.2d 631 (N.D.1992), the trial court distributed the marital property of a 28–year marriage by awarding the husband a small farming operation worth $69,170 and awarding the wife property valued at $7,790. The husband was also ordered to pay the wife $300 per month for 60 months as part of the property distribution. The trial court found that the husband was financially unable to pay spousal support. We said:

"The trial court's order, although it requires Elmer to pay $300 per month to Erika and thereby assist her in obtaining a college degree, also requires that Erika use her property settlement to obtain that degree while permitting Elmer to retain income-earning property and use the income from that property to make those payments. Thus in 1994 Elmer would be left with his income-producing property and the future income therefrom. Erika would have the personal ability to earn in the future but no property. Because it is to the advantage of both parties that Erika obtain a college degree in order that she have the opportunity to become self-supporting, the trial court should consider the payment of spousal support if the periodic

payments of property division can be structured or delayed so that Erika's needs as well as Elmer's needs and ability to pay can be accommodated. *See Smith v. Smith,* 326 N.W.2d 697 (N.D.1982)."

*Sateren,* 488 N.W.2d at 634–635 [footnote omitted]. We suggested as a possible alternative property distribution a "delay in the periodic property distribution payments during a period in which spousal support is paid," and remanded to permit the trial court to examine and resolve together the overlapping issues of the property division and spousal support. *Sateren,* 488 N.W.2d at 635 n. 3.

Vikki finds herself in a position similar to that of the disadvantaged spouse in *Sateren.* Vikki was awarded minimal immediate liquid assets after a 17–year marriage. She is 40 years old and has little work experience, no training, and only a high school education. Vikki will be required to use her property settlement payments either to assist her in obtaining job training, or merely to survive if she chooses to stay home and care for the four young children in her custody.

Larry argues that spousal support should not be awarded in this case because it is unlikely that any award would be used by Vikki to pursue further education and thereby rehabilitate herself, but would only be used "to live on until it ran out." He further argues that spousal support "would accomplish nothing more than to promote Vikki's sloth and drive one more farmer out of business."

■ There are two types of spousal support. Permanent spousal support is appropriate to provide traditional maintenance for a spouse who is incapable of rehabilitation. *Rustand v. Rustand,* 379 N.W.2d 806, 807 (N.D.1986). Rehabilitative spousal support, on the other hand, is awarded to provide a disadvantaged spouse time and resources to acquire an education, training, work skills, or experience that will enable the spouse to become self-supporting. *Routledge,* 377 N.W.2d at 545. The purpose of rehabilitative spousal support is not limited to assisting a disadvantaged spouse in achieving education-

al goals. In *Wahlberg v. Wahlberg*, 479 N.W.2d 143, 145 (N.D.1992), this court noted:

"We have, however, also described the purpose of rehabilitative support in terms of enabling a disadvantaged spouse to achieve 'suitable' and 'appropriate' self-support. *E.g. Bullock v. Bullock*, 376 N.W.2d 30, 31 (N.D.1985) [citing O'Kelly, *Three Concepts of Alimony in North Dakota Law*, 1 N.D. Faculty J. 69, 75 (1982) ]. Accordingly, we have affirmed as appropriate awards of rehabilitative spousal support under a variety of circumstances which relate to the disadvantaged spouse's capacity for self-support. Continuance of a standard of living is a valid consideration in spousal support determinations, *e.g. Bagan v. Bagan*, 382 N.W.2d 645 (N.D.1986), as is balancing the burdens created by the separation when it is impossible to maintain two households at the pre-divorce standard, *e.g. Weir v. Weir*, 374 N.W.2d 858 (N.D.1985). The trial court may consider the disparate earning capacity of the parties, *e.g. Pfliger v. Pfliger*, 461 N.W.2d 432 (N.D.1990); *Ruff v. Ruff*, 78 N.D. 775, 52 N.W.2d 107 (1952), and should make a support determination consonant with the property distribution as the illiquidity or the lack of income producing capacity of property may work a disadvantage to one spouse, *Pfliger v. Pfliger, supra.*"

▐ Although temporary spousal support to rehabilitate a disadvantaged spouse is preferred, it may be required indefinitely to maintain a spouse who cannot be adequately restored to independent economic status. *Roen v. Roen*, 438 N.W.2d 170, 172 (N.D. 1989). We also recognize that an award of spousal support must be made in light of the supporting spouse's needs and ability to pay. *Weir v. Weir*, 374 N.W.2d 858, 865 (N.D. 1985).

▐ Larry's argument that his and Vikki's earning capacities are equal is not supported by the record. Larry, who was awarded the farm, the main income-producing asset of the marriage, has demonstrated an earning ability of between $30,000 and $50,000 per year. He has acknowledged that Vikki, at present, can only work at minimum-wage jobs. His arguments about Vikki's fail-ure to apply for jobs ignore the reality that she has custody of and must care for four young children. Vikki has not been employed outside of the home since before 1975 and her entry into the job market may be difficult. *See Weir*, 374 N.W.2d at 862. Clearly, Vikki is a disadvantaged spouse. Under this divorce decree, Vikki must rely on her property distribution to live, thereby depriving her of any investment potential from that property. These circumstances show a need for spousal support, at least until Vikki can rehabilitate herself in some fashion, if that is possible, and possibly at a reduced rate for an indefinite term. The trial court's failure to award any spousal support, without explanation, is clearly erroneous. *See Martin*, 450 N.W.2d at 771.

If the reason for denying spousal support was Larry's inability to pay, various alternatives are available. Rather than the minimal $315 in liquid assets Vikki received immediately pursuant to the divorce decree, the court could award a substantial percentage of her property distribution in other available liquid assets, *i.e.*, cash accounts, crops and livestock. This could enable her to invest part of her award, or perhaps purchase a home for herself and the children, thereby avoiding rent expense, and improving their standard of living. Spousal support could be ordered to take precedence over the $500 monthly payments Larry makes to his father on the $50,300 debt, which was only acknowledged and enforced after these divorce proceedings were started. Spousal support payments could be ordered for a period of time and the property distribution payments delayed so Vikki need not dissipate her property award in order to survive. *See Sateren.* Vikki sought $800 per month in permanent spousal support. Perhaps that amount might be feasible for Larry to pay if the property distribution payments are extended or delayed. Hopefully, such alternatives will be explored by the parties and considered by the trial court on remand.

## CHILD SUPPORT

The trial court ordered Larry to pay $504 per month in child support for the four children in Vikki's custody. Purporting to apply

the Child Support Guidelines found in NDAC Chapter 75–02–04.1, the trial court found the average monthly income of the parties over the past five years to be $2,921. The trial court deducted monthly principal payments of $500 to Larry's father and $311 to the Federal Land Bank to arrive at average monthly income of $2,088. In arriving at a child support obligation of $504 per month, the trial court noted that much of the farm income during the past five years was "attributable to government payments which have been declining" and that "Larry will be paying interest to Vikki of about $7,225 per year and will be providing support for one of the five children. . . ."

▮ It is unclear to us how the trial court arrived at the $504 monthly child support obligation, and Larry acknowledges that this figure is not the presumptive amount under the guidelines. A mere recitation that the guidelines have been considered in arriving at the amount of a child support obligation is insufficient to show compliance with the guidelines. *Spilovoy v. Spilovoy,* 488 N.W.2d 873, 877 (N.D.1992). Accordingly, we conclude that the trial court erred in failing to follow the guidelines and that the award of $504 per month in child support is clearly erroneous.

The presumptively correct amount of child support is determined by calculating a scheduled percentage of the obligor's net income. *Clutter v. McIntosh,* 484 N.W.2d 846, 848 (N.D.1992); NDAC § 75–02–04.1–10. Where, as here, custody of the children is split between the parents, the amount of child support is computed for each parent, and the lesser amount is subtracted from the greater. *Spilovoy,* 488 N.W.2d at 876; NDAC § 75–02–04.1–03.

Net income received by an obligor from all sources must be considered in determining an obligor's child support. *Rueckert v. Rueckert,* 499 N.W.2d 863, 870 (N.D.1993); NDAC § 75–02–04.1–02(3). Special rules are in place for determining net income from self-employment. *See* NDAC § 75–02–04.1–05. Farm businesses require the average of the most recent five years of farm operations to be used to determine net self-employment income. NDAC § 75–02–04.1–05(3). The

guidelines also provide that some "[b]usiness costs which are actually incurred and paid, but which may not be expensed for internal revenue service purposes, such as principal payments on business loans, may be deducted to determine net income from self-employment." NDAC § 75–02–04.1–05(2). Alternatively, certain land costs of a farmer, such as the lesser of the "fair rental value of . . . land being purchased" or "total principal and interest payments actually made toward the purchase of the land," may be taken into account in averaging farm self-employment income. NDAC § 75–02–04.1–05(4). *See also Houmann v. Houmann,* 499 N.W.2d 593, 595 n. 1 (N.D.1993).

▮ In this case, Larry testified that the money loaned by his father "was used for land purchasing and to build the house that we built in '87." The guidelines take into consideration "[t]he subsistence needs, work expenses, and daily living expenses of the obligor." NDAC § 75–02–04.1–09(1)(a). Therefore, the trial court erred in deducting the entire $500 monthly principal payment Larry makes to his father in determining the child support obligation. To the extent that any of that $500 amount represents payments applied to construction of the house, rather than to farm land acquisition, that portion does not qualify as a deductible business cost. The trial court must determine what part of the $500 payment is attributable to the cost of building the house and what part is attributable to farm land acquisition.

▮ The presumptively correct child support obligation under the guidelines can be rebutted only if the trial court specifically finds on the record that a preponderance of the evidence "establishes, applying criteria established by the public authority which take into consideration the best interests of the child, that the child support amount established under the guidelines is not the correct amount of child support." NDCC § 14–09–09.7(3). The trial court made no express finding that the presumption had been rebutted in this case. *See Spilovoy,* 488 N.W.2d at 877. Although Larry has provided us with computations that arrive at a child support obligation that is "fairly close," but

higher, than that ordered by the trial court, those computations include imputing theoretical net minimum wage income to Vikki. However, the guidelines do not provide for imputing wages to an unemployed obligor. *Guskjolen v. Guskjolen,* 499 N.W.2d 126, 128 (N.D.1993); *Spilovoy,* 488 N.W.2d àt 878.

We conclude that the trial court erred in departing from the guidelines in this case and that the award of $504 per month for child support is clearly erroneous. On remand, the trial court must determine the net income of both Larry and Vikki, *see Reimer v. Reimer,* 502 N.W.2d 231, 233 (N.D.1993), in accordance with the guidelines, in assessing the proper amount of child support payable by Larry.

### ATTORNEY FEES

Vikki asserts that the trial court erred in refusing to award her attorney fees. A principal consideration in determining whether to award attorney fees in marital disputes is each party's ability to pay. *LaVoi v. LaVoi,* 505 N.W.2d 384, 387 (N.D. 1993); *Pozarnsky v. Pozarnsky,* 494 N.W.2d 148, 151 (N.D.1992). Because matters of property division, spousal support, and child support will be adjusted on remand, we also remand the matter of attorney fees to the trial court for reconsideration in conjunction with the other issues.

The amended divorce judgment is reversed and the case is remanded for further proceedings consistent with this opinion.

VANDE WALLE, C.J., and LEVINE, SANDSTROM and MESCHKE, JJ., concur.