1997 ND 176

**Gene FISHER, Plaintiff and Appellee,**

v.

**Sheila FISHER, Defendant
and Appellant.**

**Civil No. 960211.**

Supreme Court of North Dakota.

Sept. 8, 1997.

Howe, Hardy, Galloway & Maus, PC, Dickinson, for plaintiff and appellee; argued by Mary E. Nordsven.

Smith, Bakke, Hovland & Oppegard, Bismarck, for defendant and appellant; argued by Randall J. Bakke. Appearance by Scott K. Porsborg.

MESCHKE, Justice.

[¶ 1] Sheila Fisher appealed a decree of divorce from Gene Fisher that divided the marital estate equally after a $500,000 credit to Gene for premarital property, but distributed controlling stock in their major asset, Fisher Industries, to Gene. We affirm the credit and the refusal to discount the value of Sheila's minority stock, but remand the split of stock ownership for disentanglement of their ownership of Fisher Industries, if possible.

[¶ 2] Gene and Sheila were married December 26, 1968, when Gene was age forty, and Sheila was twenty-five. Sheila brought no significant property to the marriage. When they married, Gene owned real estate and interests in several businesses including one-fourth of the family business, Fisher Sand & Gravel.

[¶ 3] Early in the marriage, Gene inherited his father's interest in Fisher Sand & Gravel and bought the remaining interests from his brothers. For tax planning, Gene gifted stock to Sheila and to their four children over the years. In 1983, Gene gave controlling stock to Sheila so the company could take advantage of contracting preferences for a minority-owned business.

[¶ 4] At first, Sheila played only a minor role in Fisher Sand & Gravel, but later became more involved. Although Sheila held controlling stock after 1983, Gene principally ran the company until June 1992. Then, Sheila took control by electing three directors, including herself, to the five-member board. Gene soon sued Sheila for divorce, but they reconciled. In November, Sheila had the company pay large bonuses to Gene and herself and used them to pay back accumulated loans from the company. In December, the board ousted Gene from the company presidency and demoted him to field consultant.

[¶ 5] After twenty-five years of marriage, Gene again sued for divorce in 1994 and sought an equitable division of property. According to Gene, he did so as soon as he found out about the bonuses and their potentially adverse tax consequences. Sheila resisted the divorce.

[¶ 6] The combined business, known by the trade name of Fisher Industries, is their major marital asset. It consists of Fisher Sand & Gravel, a corporation, and its two subsidiaries, General Steel and Supply Company and Green Acres Farm. Fisher Sand & Gravel mainly processes sand, gravel, and aggregate for highway construction. General Steel designs, fabricates, and assembles equipment for mining, supplies equipment to Fisher Sand & Gravel, and also sells equipment at retail. Green Acres is a Kentucky farm that Gene and Sheila transferred to Fisher Industries in 1989 to pay back some loans from the company.

[¶ 7] Before trial, the trial court entered an Amended Interim and Extended Temporary Protection Order that gave Sheila exclusive use of the family home, prohibited Gene from coming within 150 feet of Sheila, and ordered Gene not to communicate with company employees. Gene violated this order by contacting employees and by showing up at the company's annual Christmas party when Sheila was there.

[¶ 8] At trial, they stipulated to Sheila's adultery and to Gene's spousal abuse. Gene testified Sheila was economically at fault, and Sheila testified Gene was emotionally and physically abusive. Gene testified about the property he owned before the marriage that

he valued at $1,910,000. Sheila disputed Gene's testimony about the value of his premarital property with cross-examination and her own testimony. Each claimed to be most responsible for the great success of Fisher Industries.

[¶ 9] They stipulated the total value of Fisher Industries was $21,600,000, the equivalent of $9,094.74 per share, but they could not agree on how to distribute their predominant stock ownership. Sheila proposed to buy Gene's share through sale of a substantial part of their stock to an employee stock ownership plan (ESOP) that would have required Gene to covenant not to compete. Gene proposed either to buy all of Sheila's shares (but at a price discounted for her economic fault) with some of the purchase price "to be paid over time," or to receive distribution of enough stock for majority control. For these proposals, Gene asserted he could arrange enough credit for "$5,000,000 to fund any immediate equalizing payment to Sheila."

[¶ 10] The trial court entered a divorce for irreconcilable differences and applied the *Ruff–Fischer* guidelines. *See Ruff v. Ruff*, 78 N.D. 775, 52 N.W.2d 107 (1952); *Fischer v. Fischer*, 139 N.W.2d 845 (N.D.1966). The court found Sheila guilty of adultery and Gene guilty of spousal abuse. The court valued the net marital estate at $23,110,302, including their combined 88 percent ownership of Fisher Industries stock valued at $18,326,000. The court accepted Gene's premarital property figures and awarded him $500,000 more in the division for assets he brought into the marriage. After the $500,000 award to Gene and $1,000 to Sheila in attorney fees for Gene's violations of the Interim Order, the court divided the rest of the marital estate equally.

[¶ 11] The trial court rejected Sheila's proposed ESOP-sale because it would require Gene to agree not to compete, and rejected Gene's proposal to buy all of Sheila's stock because the court was unwilling to discount the value of her shares. The court valued each stock share at the $9,094.74 agreed equivalent, accepted Gene's proposed stock division of 1,212 shares to Gene (fifty-one percent) and 869 shares to Sheila (thirty-seven percent), and dissolved the interim receivership of their stock to put Gene in control of Fisher Industries. To balance the unequal split of stock, the court ordered Gene to pay $2,365,070.34 in cash to Sheila within 90 days after entry of judgment.

[¶ 12] Sheila moved to reconsider, but the trial court denied her motion and entered the decree. Sheila appealed and moved for a stay, seeking to keep management control and to get $250,000 per year in spousal support during the appeal. Gene resisted Sheila's proposed stay and counter-moved to stay his $2,365,070.34 cash payment to Sheila during the appeal. The court denied Sheila's request to keep the status quo, stayed Gene's cash payment to Sheila pending her appeal, and ordered Gene to pay Sheila $20,000 monthly for temporary spousal support.

[¶ 13] On appeal, Sheila mainly contests the trial court's split of their Fisher Industries stock. She asserts Gene's abuse and their mutual animosity make it impossible to continue in business together. She does not contest the decision to give Gene control of the business, but argues their business relationship should have been dissolved by distributing all of the stock to Gene and by offsetting payments to her. Unless the stock is distributed this way, she contends, Gene will have exclusive use, benefit, and control of her only income-producing assets because, as a minority stockholder, she will have no effective voice in corporate activities and thus no effective way to share in corporate income. She insists her corporate remedies will be inadequate for her income needs and for protecting her minority ownership. Sheila also contends, even if their stock ownership was correctly split, the trial court should have discounted the value of her minority shares and increased her cash payment to correctly accomplish an equal division of the marital estate.

### 1. Credit For Premarital Assets

[¶ 14] In seeking a completely equal division of the marital estate, Sheila also challenges the $500,000 credit to Gene for premarital property. We are not persuaded.

[¶ 15] In a divorce, all separate property of the spouses must be included in the marital estate for distribution, but the property's origin can be a factor in making an equitable division. *Gaulrapp v. Gaulrapp*, 510 N.W.2d 620, 621 (N.D.1994). The division need not be equal to be equitable, but a trial court must reasonably explain a substantial disparity. *van Oosting v. van Oosting*, 521 N.W.2d 93, 96 (N.D.1994); *Heley v. Heley*, 506 N.W.2d 715, 718 (N.D.1993). In *van Oosting*, 521 N.W.2d at 99–100, we upheld a comparable distribution that gave one spouse a prior credit for substantial gifts received from his parents that resulted in a net distribution to the other spouse of only twenty-five percent of those gifts. Here, the trial court's relatively modest credit to Gene resulted in an effective distribution to Sheila of the equivalent of nearly thirty-five percent of the value of Gene's premarital assets.

[¶ 16] Gene's $500,000 credit came to little more than two percent of this twenty-three-million dollar estate. This relatively small deviation from equal parts was reasonably explained and did not make the 51 percent/49 percent overall division of this relatively large net estate clearly erroneous.

[¶ 17] Sheila disputes the valuation of Gene's premarital property, insisting that "any valuation of premarital assets [is] speculative at best" because "a valuation of 30–year–old property necessitates a complex analysis of inflation and other economic influences to determine the value of the property in 1968 dollars," which was not done. However, the evidence sufficiently supported the trial court's finding of the value of Gene's premarital property to justify a $500,000 credit to Gene. As we explained in *Wald v. Wald*, 556 N.W.2d 291, 295 (N.D.1996), "Marital property valuations within the range of the evidence are not clearly erroneous."

## 2. Discounting Minority Stock

[¶ 18] Sheila asserts her only real alternatives are either to sell her stock or to petition for involuntary dissolution, a corporate remedy she believes available for Gene's oppressive post-trial conduct as the controlling shareholder, citing *Schumacher v. Schumacher*, 469 N.W.2d 793, 797 (N.D.1991)(examples of oppressive conduct warranting relief include refusal to declare dividends, payment of "exorbitant salaries and bonuses" to majority shareholder-officers, and payment of high rent for property leased from majority shareholders). Sheila contends, however, both alternatives are inadequate because a potential purchaser will pay much less for a non-controlling interest and a dissolution will certainly discount the value of her minority shares. Thus, she argues, the trial court should have discounted her minority shares to reflect their real economic value, and accordingly increased her compensatory cash payment to equalize the marital division. We are not persuaded.[1]

[¶ 19] We have recognized that purchasers are less willing to buy a non-controlling interest in a close corporation marred by dissension. *Balvik v. Sylvester*, 411 N.W.2d 383, 386 (N.D.1987). Controlling stock naturally carries more value because a buyer will pay more for the privilege of directly influencing the corporation's affairs. 18A Am. Jur.2d *Corporations* § 795 (1985). Thus, Sheila may be correct that her shares alone would be worth less to a potential buyer. However, she is not correct that her corporate remedies would be so inadequate that the value of her minority shares would be discounted upon dissolution.

[¶ 20] While we have recognized "valuation of minority shares in a close corporation ... is problematic at best," we have also explained our Business Corporation Act gives significant protection to minority shareholders. *Fisher v. Fisher*, 546 N.W.2d 354, 357

---

1. Even if we were to agree that a minority discount would have been appropriate here, we could not fault the trial court for failing to do so. Sheila submitted no evidence for such a discount. She claims she did not expect this kind of stock division, but Gene proposed it at trial, and Sheila could have made an offer of proof on the discounted value of minority stock with her motion for reconsideration. Therefore, we reject her argument that, "[b]ecause neither party anticipated receiving a minority interest, expert testimony on the 'problematic' issue of minority value would have been wasteful and irrelevant." We do not entertain new arguments that were not made to the trial court.

(N.D.1996); *see* NDCC ch. 10–19.1. Under NDCC 10–19.1–115(1)(b)(3), a mistreated shareholder may obtain a corporate dissolution if "[t]he directors or those in control of the corporation have acted in a manner unfairly prejudicial toward one or more shareholders." As an alternate to dissolution, the court can force the corporation or certain shareholders to purchase the shares of mistreated shareholders at "fair value" if it "would be fair and equitable to all parties under the circumstances of the case." NDCC 10–19.1–115(3)(a). If the parties do not agree on fair value, NDCC 10–19.1–115(3)(c) requires the court to ascertain fair value under NDCC 10–19.1–88(10):

> The court ... shall determine the fair value of the shares, taking into account any and all factors the court finds relevant, computed by any method or combination of methods that the court, in its discretion, sees fit to use, whether or not used by the corporation or by a dissenter.

[¶ 21] In *Kaiser v. Kaiser*, 555 N.W.2d 585 (N.D.1996), we upheld an 11.3 percent discount of a minority interest in a family-held corporation in a divorce case against the contention that the discount should have been greater. But we discussed how to fix a fair value of minority stock in *Brown v. Hedahl's–Q B & R, Inc.*, 185 N.W.2d 249 (N.D.1971), without dictating a minority discount. And in *KBM, Inc. v. MacKichan*, 438 N.W.2d 181, 184 (N.D.1989), we affirmed a fair value set without a discount for a withdrawing minority shareholder.

[¶ 22] "[A]lmost all of the courts that have considered the question" have refused to apply a discount in valuing stock to protect a minority shareholder. Christopher Vaeth, Annotation, *Propriety of Applying Minority Discount to Value of Shares Purchased by Corporation or its Shareholders from Minority Shareholders*, 13 A.L.R.5th 840, 850 (1993). They realize the diminished value of a minority interest alone, but conclude that fact is irrelevant when the purchaser is the corporation or shareholders who control it. *Charland v. Country View Golf Club, Inc.*, 588 A.2d 609, 611–12 (R.I. 1991). Those courts recognize the purpose of the corporate dissolution remedy intends

"[n]o discount should be applied simply because the interest to be valued represents a minority interest in the corporation." *Blake v. Blake Agency, Inc.*, 107 A.D.2d 139, 486 N.Y.S.2d 341, 349 (1985). *Brown v. Allied Corrugated Box Co., Inc.*, 91 Cal.App.3d 477, 154 Cal.Rptr. 170, 176 (1979), explained that "the statutes suggest that a minority shareholder who brings an action for the involuntary dissolution of a corporation should not, by virtue of the controlling shareholder's invocation of the buy-out remedy, receive less than he would have received had the dissolution been allowed to proceed."

[¶ 23] For shareholders dissenting from changes in a closely-held corporation, the courts fixing "fair value" have often refused to apply a minority discount. *See MT Properties, Inc. v. CMC Real Estate Corp.*, 481 N.W.2d 383, 388 (Minn.App.1992)("because the legislature has enacted the statute with the evident aim to protect the dissenting shareholder, we must prohibit application of minority discounts when determining 'fair value' in statutory dissenter's rights cases"); *In re Valuation of Common Stock of McLoon Oil Co.*, 565 A.2d 997, 1003 (Me. 1989); *Columbia Management Co. v. Wyss*, 94 Or.App. 195, 765 P.2d 207, 213–14 (1988). As the Delaware Supreme Court explained in *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1145 (Del.1989):

> Discounting individual share holdings injects into the appraisal process speculation on the various factors which may dictate the marketability of minority shareholdings. More important, to fail to accord to a minority shareholder the full proportionate value of his shares imposes a penalty for lack of control, and unfairly enriches the majority shareholders who may reap a windfall from the appraisal process by cashing out a dissenting shareholder, a clearly undesirable result.

We agree a trial court ascertaining "fair value" of minority shares under the Business Corporation Act should not automatically discount their value. That seems particularly true where, as here, the affected shareholders have agreed to the total value of the corporation, making each share worth $9,094

in their business relationship as well as in their marital relationship.

[¶ 24] We conclude Sheila's corporate remedies should adequately protect her minority interest in Fisher Industries. To divide the marital estate, the trial court did not err in valuing each of Sheila's minority shares at the same value as each of Gene's controlling shares.

[¶ 25] Still, a corporate remedy should be implemented concurrently with this divorce to avoid multiplying litigation and to achieve judicial efficiency. If Gene and Sheila cannot get along as husband and wife, the courts cannot expect them to get along as business associates.

### 3. Disentanglement

[¶ 26] To reduce further conflict, litigation, and rancor between these former spouses, we conclude a corporate remedy should be implemented, if possible, to effectively complete their marital dissolution by disentangling their business connections.

[¶ 27] In a divorce, the trial court must make an equitable distribution of the marital assets. NDCC 14–05–24. A trial court's property division is a finding of fact that will not be set aside unless it is clearly erroneous. *Heley v. Heley*, 506 N.W.2d at 718. A finding is clearly erroneous when this Court is left with a definite and firm conviction that a mistake has been made. *Linrud v. Linrud*, 552 N.W.2d 342, 345 (N.D.1996). Here, we are definitely and firmly convinced that it was a mistake to keep these former spouses together in a business relationship that will inevitably lead to more litigation.

[¶ 28] After this divorce action began, Gene alleged Sheila was mismanaging their company. Sheila alleged Gene was wrongfully interfering in the business. Reacting to their contentions on its own motion in November 1995, the trial court appointed a receiver for both Gene's and Sheila's stock in Fisher Industries "to protect the one major asset of the marriage" pending the divorce decision. In doing so, the court found "the file and the record exhibit substantial hostility between the parties in this action."

[¶ 29] In appointing the receiver, the trial court denied a related motion by three of Gene and Sheila's four children, all adults who hold small percentages of Fisher Industries stock, to intervene "for the purpose of opposing the appointment of a receiver." *Fisher v. Fisher*, 546 N.W.2d 354, 355 (N.D. 1996). Sheila and the three children had insisted appointing the receiver would "obviously" damage the value of Fisher Industries stock. Gene and the fourth child had supported appointment of the receiver and opposed the intervention. The three children appealed. *Id.* We affirmed the denial of intervention because under NDRCivP 24 the children's minority interests in a closely-held corporation did not include the right to intervene in a divorce action between the majority shareholders. *Id.*

[¶ 30] Later, soon after the trial in this case, the receiver filed a Second Interim Report summarizing the effect of the marital conflict on Fisher Industries:

> The conflict between Gene Fisher and Sheila Fisher ... is, in the view of the Receiver, the corporation's most significant problem. The conflict ... is a power struggle in two respects: (1) it is apparent both Gene Fisher and Sheila Fisher have a desire to control Fisher Sand & Gravel, Co.; (2) it is also apparent Sheila Fisher and Gene Fisher have differing philosophies on how the company should be managed and operated.
>
> ... [B]oth indicated they would like to operate the company in his or her own manner and style. Neither has indicated a willingness to share the power base even to the extent it had been shared in the past. Sheila Fisher indicates sharing has not worked in the past. Gene['s] ... activity as a consultant has however resulted in the dismissal of key individuals in the South Dakota/Wyoming area and contributed to other poor employee morale. Gene Fisher expresses no desire to share the control of the company.

This Receiver's report concluded:

> ... [T]hey will not work together at the same time. Gene Fisher's ideas and Sheila Fisher's ideas are incompatible. It appears to the Receiver that Gene Fisher

and Sheila Fisher will not be able to work as co-managers or co-CEO. One or the other or some third party has to be in charge and have the freedom to run the company for the good of the company.

[¶ 31] Their contentiousness is also depicted by the clerk's docket record that listed more than 500 separate items filed before trial began in this case on April 22, 1996. When the trial finished 12 days later on May 3, 1996, over 350 exhibits had been marked for evidence. The bitterness of this conflict calls for complete disentanglement of their business connections.

[¶ 32] Other courts have generally avoided splitting stock in a closely held corporation between contentious divorcing spouses in a way that continues their conflicts in an ongoing business relationship. *See* Sonja A. Soehnel, Annotation, *Divorce: Propriety of Property Distribution Leaving Both Parties with Substantial Ownership Interest in Same Business*, 56 A.L.R.4th 862 (1987). One court explained why it was particularly inequitable to split closely held stock between divorcing spouses: "Such a financial arrangement is intolerable ... and places the spouse without any real control over the closely held corporation at a distinct disadvantage to the spouse who runs the business." *Robbins v. Robbins*, 549 So.2d 1033, 1033–34 (Fla.Dist.Ct.App.1989) (citations omitted). The Utah Supreme Court reasoned in *Argyle v. Argyle*, 688 P.2d 468, 471 (Utah 1984): "Wherever possible, this Court avoids division of marital stock between the parties because it forces them to be in a 'close economic relationship which has every potential for further contention, friction, and litigation.'"

[¶ 33] We, too, prefer the kind of distribution of the marital estate that will "disentangle the parties' financial affairs." *Heggen v.*

*Heggen,* 541 N.W.2d 463, 465 (N.D.1996). Disentanglement allows one former spouse to operate the business without harmful interference by the other, and it reduces further conflict between them. *Linrud,* 552 N.W.2d at 346; *Heley,* 506 N.W.2d at 718. *See also Martin v. Martin,* 450 N.W.2d 768, 769–70 (N.D.1990); *Linn v. Linn,* 370 N.W.2d 536, 543 (N.D.1985); *Graves v. Graves,* 340 N.W.2d 903, 907 (N.D.1983). As *Volk v. Volk,* 404 N.W.2d 495, 499 (N.D.1987), held: "[W]here a party has specifically requested that the property be separately distributed and there clearly exists illwill between the parties involved that militates against cooperation in disposal of the marital estate, the trial court should partition and distribute the marital property separately to each spouse."

[¶ 34] Here, Gene and Sheila amply demonstrated, if not virtually agreed, they could not work together, and each effectively sought a complete separation from any continuing business relationship with the other. Disentanglement is preferred in this context.

### 4. Remand

[¶ 35] On remand, the trial court should reconsider its split of the stock ownership. If necessary, it may hold a further evidentiary hearing to ascertain the best way to disentangle Gene and Sheila from their business relationships. The court may consider redistribution of the marital estate, including one or more spin-offs, split-offs, or split-ups to sever the General Steel subsidiary, the Green Acres Farm subsidiary, or any other separable business part of Fisher Industries that may be feasible. To do so, the court may take into account and adjust for direct and foreseeable tax consequences of the corporate separations, if any, including the use of contingent conditions to equitably apportion the tax effects, if possible.[2]

2. Unless tax-free spin-offs, split-offs, or split-ups are possible, there are likely to be some income tax consequences, despite the Internal Revenue Code § 1041(a) directive: "No gain or loss shall be recognized on a transfer of property from an individual to (or in trust for the benefit of)—(1) a spouse, or (2) a former spouse, but only if the transfer is incident to the divorce." For an example, *see Blatt v. Commissioner*, 102 T.C. 77, 1994 WL 26306 (1994)(1987 redemption pursuant to a divorce decree of all W's stock in X corporation owned equally by H and W "was not a transfer to a third party on behalf of H under sec. 1.1041–IT, Q & A 9, Temporary Income Tax Regs., 49 Fed.Reg. 34453 (Aug. 31, 1984). Accordingly, X's payment to W in redemption of her stock was taxable to her in the year of redemption. *Arnes v. United States*, 981 F.2d 456 (9th Cir.1992), not followed.").

Expert testimony will no doubt be necessary to gauge tax consequences. If the trial court is

*See Kaiser v. Kaiser,* 474 N.W.2d 63, 69–70 (N.D.1991)("We agree ... that a trial court in a divorce action should consider potential taxes in valuing marital assets only if ... the recognition of a tax liability is required by the dissolution or will occur within a short time ... and ... the tax liability can be reasonably predicted."). *See generally* 1 William H. Painter, *Painter on Close Corporations,* ch. 6 and 7 (1997)(discussing alternative methods and tax consequences of buying-out a shareholder); 14A Steven C. Alberty, *Fletcher Cyclopedia of the Law of Private Corporations* § 6970.89–6970.138 (1991)(same). If, on remand, the trial court orders deferred payments to complete the disentanglement and the redemption of the minority shares, the deferred payments should be reasonably secured and structured so that the seller receives full payment within as short a time as reasonably possible without imposing a crippling hardship on the purchaser. *Heggen,* 541 N.W.2d at 465. If needed, of course, the trial court may also order appropriate spousal support until the separation is completed.

[¶ 36] We affirm the credit to Gene for premarital property and the valuation of Sheila's minority stock without a discount, but we reverse and remand for reconsideration of the split of stock ownership in light of this opinion. If possible, disentanglement by distribution of the entire stock to one spouse, with compensatory separations of corporate assets and payments to the other spouse to accomplish the nearly equal division of the marital estate already decreed should be considered. If it can be done, the trial court should disentangle Gene's and Sheila's business as well as their marriage. On the other hand, if disentanglement is precluded by some as yet unidentified factors or considerations, the trial court should make findings to support a disposition that fails to disentangle their business, interests, and property, and to satisfactorily explain why disentanglement is not fairly possible.

[¶ 37] VANDE WALLE, C.J., and NEUMANN and MARING, JJ., concur.

SANDSTROM, Justice, concurring and dissenting.

[¶ 38] I concur in part 1 and all but ¶ 25 of part 2 of the majority opinion. Because I am not left with a definite and firm conviction a mistake has been made, I dissent from ¶ 25 of part 2 and from parts 3 and 4. *See* ¶ 27; *Linrud v. Linrud,* 552 N.W.2d 342, 345 (N.D. 1996).

[¶ 39] The majority's parts 3 and 4 lack internal coherence, and are perhaps best understood by remembering: "A camel is a horse designed by a committee." At ¶ 27, the majority writes: ."Here, we are definitely and firmly convinced that it was a mistake to keep these former spouses together in a business relationship that will inevitably lead to more litigation." The majority then proceeds to contradict its professed "definite and firm conviction" the trial court erred by failing to disentangle when it split the stock ownership. At ¶ 35, it says "the trial court should *reconsider* its split of the stock ownership" (emphasis added). At ¶ 36, "we reverse and remand for *reconsideration* of the split of stock ownership," *"[i]f* it can be done"; "[o]n the other hand, *if* disentanglement is precluded" and "why disentanglement is not fairly possible" (emphasis added). A "nagging concern" an error *may or may not* have been made is not a ground for reversal.

[¶ 40] I would affirm.

[¶ 41] Dale V. Sandstrom

---

dissatisfied with the presentations of the parties' experts, the court may, of course, use the provisions of NDREv 706 or a special master at the expense of the parties to make recommendations.